FLEMING et al. v. OKLAHOMA TAX COMMISSION.

No. 3264.

Circuit Court of Appeals, Tenth Circuit.

Oct. 30, 1946.

Eaton Adams, of Chicago, Ill. (W. V. Hodges, of New York City, J. L. Goree, of Chicago, Ill., W. R. Bleakmore, of Oklahoma City, and W. F. Peter, of Chicago, Ill., on the brief), for appellants.

C. W. King, of Oklahoma City, Okl. (E. L. Mitchell and E. J. Armstrong, both of Oklahoma City, on the brief), for appellee.

Before PHILLIPS, HUXMAN and MURRAH, Circuit Judges.

HUXMAN, Circuit Judge.

This was an action brought by Joseph P. Fleming and Aaron Colnon, trustees of the Chicago, Rock Island and Pacific Railway Company, a corporation,[1] against the Oklahoma Tax Commission,[2] to recover additional state income taxes which had been paid under protest for the years 1941 and 1942. The action was instituted in the United States District Court for the Western District of Oklahoma. It was tried to the court without a jury.

The Railroad is a transportation company engaged in the transportation of freight and passengers, and its principal source of income is the revenue derived from the furnishing of such service. It operates its lines in fourteen states, including Oklahoma. Its lines from Memphis, Tennessee, to Tucumcari, New Mexico, traverse the State of Oklahoma from east to west at about the center of the state. Its lines from Chicago, Illinois, Kansas

---

[1] Herein called the Railroad.   [2] Herein called the Commission.

City, Missouri, and Wichita, Kansas, to Fort Worth, Galveston and other points in Texas traverse the state from north to south at about the center of the state. These lines connect with all other operating lines of the railway and are a part of the system. The heaviest portion of the traffic or tonnage of the railway moves between Davenport, Iowa, and Chicago, Illinois. The next in importance is the tonnage which moves from Wichita, Kansas, through Allerton to Davenport, Iowa. Traffic and tonnage between Wichita, Kansas, and El Reno, Oklahoma, were the heaviest of the lines operating in Oklahoma, and compared favorably with the traffic and tonnage which moved elsewhere, excluding therefrom the portions of the system mentioned above. There was a substantial transportation of freight and passengers between El Reno, Oklahoma, and Memphis, Tennessee. The main and branch lines of the system funneled the freight and passenger traffic of the railway to the point of heaviest tonnage between Davenport and Chicago, and in general the movement of traffic harmonized with the trend of railway traffic between Chicago and the southwest. The portions carrying the heaviest tonnage contributed most to the railway income, but each portion of the system contributed to the freight, passenger, express traffic and income of the railway, and each part of the system contributed to the traffic handled and income received by the various branches, lines, or parts of the system.

The Commission accepted the system's net revenue as reflected by the books of the Railroad. No question as to proper methods of accounting is therefore presented, and it is not thought necessary to encumber the record with detailed statements of facts and figures showing the methods of accounting. The Commission treated the Railroad as a unitary enterprise and allocated the net system income according to the formula provided for in Section 878 (g), 68 O.S.A. The trial court in its findings of fact and conclusions of law approved the method of allocation adopted by the Commission.

Oklahoma has adopted a comprehensive statute for the levying and collection of income taxes from both individuals and corporations.[3] For the purpose of the question presented by this appeal, it is necessary to consider only portions of Section 878 of the Act. Subsection (e) in part provides: "(1) Income from real and tangible personal property, such as rents, oil and mining production or royalties, and gains or losses from sales of such property, shall be allocated in accordance with the situs of such property; (2) Income from intangible personal property, such as interest, dividends, patent or copyright royalties, and gains or losses from sales of such property, shall be allocated in accordance with the domiciliary situs of the taxpayer, except that (3) Income from property, such as described in Paragraph (2) of this subsection, which has acquired a business or commercial situs apart from the domicile of the taxpayer shall be allocated in accordance with such business or commercial situs."

Subsection (f) provides that: "Net income (or loss) from a business activity of substantial separateness and completeness, such as might be maintained as an independent business (however convenient and profitable it might be if operated conjointly with a related activity) and capable of producing a profit in and of itself, shall be separately allocated to the State in which such activity is conducted." Subsection (g) provides that: "It is intended that the net income (or loss) remaining after the separate allocations in subsections (e) and (f) supra, shall be only that which is derived from the conduct in more than one state of a single business enterprise (commonly called unitary business), all the factors of which enterprise are essential to the realization of an ultimate gain derived from the enterprise as a whole, and not from its component parts which are too closely connected and necessary to each other to justify division or separate allocation in subsection (f) supra." Subsection (g) then proceeds by requiring that as to unitary businesses system net income shall be allocated by em-

---

[3] See 68 O.S.A. Ch. 21.

ploying the factors enumerated in Paragraphs 1, 2, and 3. Paragraph 1 provides for the ratio of the average accumulated investment at the beginning and close of the taxable year in tangible property, both real and personal, owned and used in Oklahoma, by the taxpayer, to the total of such investment in like property so owned and used by the taxpayer everywhere. Paragraph 2 provides for the ratio of expenditure in furtherance of the enterprise for direct costs of operation within Oklahoma to the total of such expenditure everywhere. Paragraph 3 provides for the ratio of gross sales or gross revenues of the enterprise within Oklahoma to the total of such sales or revenues everywhere.

The Commission employed the above three factors in allocating system net revenue to Oklahoma for income tax purposes. The trial court found that the railroad was a unitary business enterprise, all of the factors and parts of which were essential to the realization of an ultimate gain and that the portion of the lines and business activities in Oklahoma were not of such substantial separateness as to constitute an independent business within the meaning of Subsection (f), and that the net income of the railroad for the years in question was derived from the conduct of a single business enterprise. The court concluded as a matter of law that the statutory method for the apportionment of net income to Oklahoma on the basis of the average of the three arithmetical factors outlined above was not unreasonable or arbitrary in the absence of an affirmative showing to the contrary, and that the railroad had failed to show that the employment of the statutory method produced an arbitrary result in the instant case. On these findings and conclusions, judgment was entered against the Railroad, and it has appealed.

For the purpose of the opinion, the assignments of error can be grouped as follows: (1) The court erred in concluding that the railroad was a unitary business; (2) that in any event by the approved methods of accounting employed by the railroad, its books reflected with reasonable clarity the income realized from the operations within each state, and that therefore the income should be allocated under Subsections (e) and (f); and (3) that if Subsection (g) applies, it is unconstitutional, because it allocates to Oklahoma income earned outside the state, and therefore contravenes the Fourteenth Amendment to the Constitution.

What is a unitary business for the purpose of allocating taxable value has been clearly settled by the decisions of the Supreme Court over a long period of time. Its characteristics are restated in Butler Bros. v. McColgan, 315 U.S. 501, 62 S.Ct. 701, 86 L.Ed. 991, where Justice Douglas said: "At least since Adams Express Co. v. Ohio [State Auditor], 165 U.S. 194, 17 S.Ct. 305, 41 L.Ed. 683, this Court has recognized that unity of use and management of a business which is scattered through several States may be considered when a state attempts to impose a tax on an apportionment basis." The test was laid down to be whether all factors were essential to the ultimate realization of gain.

The very nature of a vast continental or interstate transportation system brings it especially within this concept of a unitary business. A railroad may well be likened to a spider's web, in which all of the strands are necessary to the common design and each contributes its necessary part to a single goal. It may be true, as urged by the Railroad, that the Chicago to Denver branch could be operated profitably by itself and that the income realized from its operation can be ascertained. It does not, however, follow that it could be operated as profitably by itself or that its income would be as great as it is as a part of a large railway network in which other parts lessen overhead burdens or funnel business to the system, which ultimately finds its way to this branch. No doubt its connection with the rest of the system brings it business which otherwise might well go elsewhere. To this extent it is dependent upon the rest of the system, and it cannot be said that no part of the income realized from the operation of this branch does not accrue by virtue of its connection with a large railway transportation system.

It is next urged that even if the railroad is a unitary enterprise, its income is taxable under Subsections (e) and (f). The argument in support of this contention is that under the approved methods of accounting employed by the Railroad, the income derived from the operation of the business within each state can be determined with reasonable accuracy, and that such income therefore must be allocated under Subsections (e) and (f). The method of accounting employed by the Railroad credits revenue derived from business originating in and destined to points within a state and moving wholly within a state to that state, and the revenue derived from interstate business (in- or out-bound or passing through) is assigned to a state on a straight mileage basis. Expenses are apportioned on various bases. It will be necessary to consider only some of these—thus, costs of all ties, rails, tracks, material, maintenance of buildings, stations, water stations, and power plants, are charged to the state in which they occur. From this the railroad contends that the revenue earned within a state is accurately ascertained and is to be allocated under Subsection (e). In answer to this, it is sufficient to say that Subsection (e) does not relate to any part of the income of a unitary enterprise. It deals with property or income of an entirely different character or nature, as a careful reading thereof will reveal.

Neither is Subsection (f) applicable to an interstate unitary business. It applies to an interstate business which, while operated as a unit, consists of departments more or less distinct and complete in themselves, such, for instance, as the business of the Magnolia Petroleum Company, which was before the Supreme Court of Oklahoma in Magnolia Petroleum Co. v. Oklahoma Tax Comm., 190 Okl. 172, 121 P.2d 1008. It had a producing, a refining, and a marketing department. None of the refineries was located in Oklahoma.

The Commission attempted to tax the company under Subsection (g) as a unitary enterprise, but the Supreme Court held that it came within the provisions of Subsection (f).

We construe Subsection (g) of Section 878 to mean that when it is once determined that an interstate enterprise is a unitary one as defined, then its system income is to be allocated under Subsection (g). We think that Subsection (g) means that after the Commission once has allocated the income from interstate businesses, as defined by Subsection (f), that is interstate businesses having units separate and sufficient in themselves, there remains only income to be allocated from strictly unitary businesses as defined in Subsection (g), and that that income shall be allocated as provided for therein.

Finally, it is contended that the application of Subsection (g) to the net income of the railroad offends the Fourteenth Amendment to the Constitution. It is argued that by the use of the formula set out in Subsection (g), Oklahoma levies a tax on income that does not have its situs within the boundaries of the state. But Oklahoma does not seek to tax property beyond its borders. It seeks to reach only its fair share and proper proportion of a unit income of a unitary system operating within its borders, and the only question is whether the statutory method of allocation reasonably tends to bring this about. If it does, the protective provisions of the Fourteenth Amendment are satisfied.

In a long line of cases, the Supreme Court has recognized the right of a state to value the property of a unitary enterprise, including railroads, as a unit, and apportion to the state its fair ratable portion of such value by methods fairly tending to reflect its ratable portion of such unit value.[4] The Railroad recognizes the principle of these cases, but contends that it applies only to ad valorem taxes and does

---

[4] Western Union Tel. Co. v. Commonwealth of Mass., 125 U.S. 530, 8 S.Ct. 961, 31 L.Ed. 790; State of Maine v. Grand Trunk R. Co., 142 U.S. 217, 12 S.Ct. 121. 163, 35 L.Ed. 994; Pittsburgh, C., C. & St. L. R. Co. v. Backus, 154 U.S. 421, 14 S.Ct. 1114, 38 L.Ed. 1031; Pullman's Palace Car Co. v. Commonwealth of Pennsylvania, 141 U.S. 18, 11 S.Ct. 876, 35 L.Ed. 613; Adams Express Co. v. Ohio State Auditor, 165 U.S. 194, 17 S.Ct. 305, 41 L.Ed. 683.

not control the imposition of income taxes. This attempts a distinction without a difference. In both instances the tax is levied against property. In the one case, it is levied against tangible property and in the other against intangible property. But in both instances it is levied against unit value of a unitary enterprise. It would be just as unlawful for a state to employ methods of allocation which would give to it more than the reasonable value of the physical property within its borders for ad valorem tax purposes as it would be to take more than its reasonable ratable portion of unit income for income tax purposes.

Various methods of allocating unit income have been upheld by the Supreme Court. In Underwood Typewriter Co. v. Chamberlain, 254 U.S. 113, 41 S.Ct. 45, 65 L.Ed. 165, an allocation of income on the basis of the value of the real estate and tangible personal property within the state compared to the total value of all such property belonging to the business was approved in the absence of a showing that an untenable result followed. In Bass, Ratcliff & Gretton, Ltd., v. State Tax Commission, 266 U.S. 271, 45 S.Ct. 82, 69 L.Ed. 282, the formula used was the proportion which the aggregate value of specified assets of the corporation within the state bore to the total value of all such assets. In Butler Bros., supra, the Supreme Court said: "We cannot say that property, pay roll, and sales are inappropriate ingredients of an apportionment formula. We agree with the Supreme Court of California that these factors may properly be deemed to reflect 'the relative contribution of the activities in the various states to the production of the total unitary income', so as to allocate to California its just proportion of the profits earned by appellant from this unitary business."

Mathematical exactness in allocating system value is impossible of attainment. Any method will contain imperfections. The railroad recognizes that factors of allocation, both as to revenues and expenses, are necessary in its system of accounting. Some of the errors in the methods used by the railroad in allocating income and expenses to so-called purely intrastate business, as well as interstate business, are clearly apparent. Under the railroad's method of allocating what it terms intrastate expense, the cost of heavy rails, ties and double tracks required by the fast, heavy, trans-system trains is all charged to Oklahoma, although none of such installations perhaps would be required for the purely intrastate business. Likewise, maintenance expenses of water towers and coal chutes erected near the state line are charged to Oklahoma, although they are used by the system outside of the state. These illustrations could be multiplied, but they suffice to show the fallacy in the argument that the cost of operation or receipt of revenue in a strictly unitary enterprise is susceptible of allocation to the segment of the system in which they occur.

Oklahoma recognizes that it may not employ the statutory formula in those specific cases in which it would produce an arbitrary or unreasonable result. Nor does it seek to do so. Subsection (h) provides that upon a showing that the statutory method of apportionment produces an unwarranted result, the Commission is empowered to permit, or may require elimination of, substitute of, or additional factors in order to allocate a reasonable proportion of unit income to Oklahoma. It was the railroad's duty not only to point out in what manner the application of the statutory formula ascribed extra-territorial value to Oklahoma,[5] but also propose methods which would bring about the desired permissible result. It failed in both respects. We find no reversible error, and the decision of the trial court is accordingly affirmed.

---

[5] Butler Bros. v. McColgan, 315 U.S. 501, 62 S.Ct. 701, 86 L.Ed. 991; Underwood Typewriter Co. v. Chamberlain, 254 U.S. 113, 41 S.Ct. 45, 65 L.Ed. 165; Bass, Ratcliff & Gretton, Ltd., v. State Tax Comm, 266 U.S. 271, 45 S.Ct. 82, 69 L.Ed. 282.