COOK, COMMISSIONER OF REVENUES, *v.* KANSAS CITY SOUTHERN RAILWAY COMPANY.

4-8268                                   205 S. W. 2d 441

Opinion delivered November 3, 1947.

Rehearing denied December 1, 1947.

254

*O. T. Ward,* for appellant.

*Joseph R. Brown,* for appellee.

Griffin Smith, Chief Justice. This is a suit by Kansas City Southern Railway Company to recover income tax payments made under deficiency assessments for 1941 and 1942. Deductions reported by the Railway Company applicable to operating expenses are involved. While discussions relating to these items were in progress it was found that a determination of the correct method of accounting for one year would be decisive of contentions affecting the second year; hence for the purpose of this opinion 1941 alone is discussed.

Act 118, approved March 9, 1929, Art. II, Sec. 3(e); Pope's Digest Sec. 14026(e), fixes the method for determining taxable income of a utility such as we are dealing with.[1]

Exhibit "A" is a map of the system, starting at Kansas City and extending generally southward to Texarkana and from there southeastward to Shreveport, thence to New Orleans.

The income from railway operations for 1941 applicable to the entire system is shown by the Company's auditor-witness Anderson to have been $19,163,035.29, with expenses of $12,275,828.76. That part of the income apportionable to Arkansas is $3,248,586, against which operating expenses claimed are $2,239,472.46. The Commissioner contends that the expense item is excessive by $158,421.86 and that the correct amount should be $2,081,050.60.

The second point of disagreement relates to cost of freight cars hired, rented, or leased by the system. The entire outlay is given as $1,031,670.26, with $212,303 apportioned to Arkansas. The Commissioner thinks the apportionment should have been $174,856.25 and disallowed $37,446.75.

A third point of difference between the Commissioner and the Company involved interest on the funded debt. An agreement favorable to the Commissioner's

[1] "When the business of such utility is partly within and partly without the State, their net income within the jurisdiction of this State shall be ascertained by taking their gross 'operating revenues' within [this] State, including in this gross 'operating revenues' within the State the equal mileage proportion within the State of their interstate business and deducting from their gross 'operating revenues' the proportionate average of operating expenses or operating ratio for their whole business as shown by the Interstate Commerce Commission standard classification of accounts. To the net operating revenues thus determined shall be added revenues from miscellaneous operations within the State and other non-operating income from sources within the State, together with a proportionate part based upon the ratio of gross operating revenues from sources within the State to their entire gross operating revenues of all non-operating income from sources other than within this State and deducted therefrom miscellaneous operating expenses within the State and a proportionate part of all deductions from gross income as set forth in the Interstate Commerce Commission Classification of accounts based upon the proportionate average of operating expenses for their whole business."

claims was reached, eliminating that part of the controversy.

It is conceded that the Arkansas law was complied with by State auditors in making the deficiency recommendations to the Commissioner, hence a construction of the Act is not required except to the extent that an understanding may be had regarding provisions it is claimed place an undue burden on interstate commerce and at the same time produce discriminatory results. There is a contention that enforcement of Act 118 in its application to the Company's system—made unusual because of geography and state boundaries—has the effect of taking property without due process of law.

Kansas City Southern as a whole operates in six states—Missouri, Oklahoma, Kansas, Arkansas, Louisiana, and Texas. In addition it controls other lines, one of which—the Arkansas Western—runs from Forester, Ark., and joins the K. C. S. at Heavener, Okla. Another is the Arkansas & Louisiana.

Anderson's testimony was that in 1941 the Company's total main line mileage was 878.78, of which 17.56% or 154.31 miles traversed Arkansas. Exact mileage varies from year to year with improvements or abandonments, but this is unimportant here.

Operating expenses claimed by the Company to be apportionable to Arkansas are reported to the Interstate Commerce Commission under more than a hundred different headings, such as maintenance of right-of-ways, operation of trains, and other elements entering into the general plan of transportation.

As previously mentioned, operating expenses for 1941 charged to Arkansas were $2,239,472.46, or 68.94% of $3,248,596 revenue apportionable to Arkansas. It is conceded by the Company that the system operating ratio computed according to Act 118 is 64.06. This is arrived at by dividing operating expenses of $12,275,828.76 into operating revenue of $19,163,035.29. If, however, the deduction of $158,421.86 is taken from operating expenses

of $2,239,472.46 claimed by the Company to be apportionable to this State, the remainder is $2,081,050.60, and the ratio of this expense to the operating revenue of $3,248,596 is 64.06% instead of 68.94—a difference of 4.88%.

Two methods of calculations are discussed by the auditors. One is based upon revenue ratio, the other on operating ratio. Under the revenue ratio method income of $19,163,035.29 is divided by that part apportionable to Arkansas ($3,248,596) and the result is 16.95%. If we multiply system operating expenses of $12,275,828.76 by 16.95% the result is $2,081,050.60. Using the operating ratio method the item of $3,248,596 is multiplied by the Arkansas ratio of 64.06% to produce $2,081,050.60.

But, irrespective of percentage yields, the essential fact is that included in the expense account of $2,239,472.46 there is an alleged overcharge of $158,421.86, and the question is whether the method used by the Railroad Company when it deviated from our statute was appropriate. If the system operating ratio of 64.06% is appropriate, then the controverted difference of $148,421.86 is accounted for and the Commissioner's allowance of $2,081,050.60 is correct.

As a point of argument the Railway Company has taken ratios based upon a list of grouped expenses in their relation to system expenses, "as compared with other operating performance ratios for Arkansas in 1941," as follows: Track miles, 17.56; train miles, 17.90; locomotive miles, 17.23; car miles, 20.65; net ton miles revenue, 19.55; passenger miles revenue, 19.47. The total of these items is 114.36, the average of these ratios— 114.36 divided by 6—being 19.06. But the Company's witness testified that locomotive miles in 1941 were 19.23%—not 17.23% as the tabulation shows. In explaining why the revenue ratio of 16.95 as provided by the Arkansas statute should not apply, Anderson testified that the Company realized greater net ton-mile revenues from that part of its system outside of Arkansas, there being "more remunerative rates and divisions for movement of petroleum products eastbound from Shreveport

and Texarkana and for military supplies and equipment consigned to Camp Crowder in Missouri and Camp Polk in Louisiana. Another cause is that, since less traffic is originated or terminated in Arkansas than in the other states, there is a proportionately greater amount of intermediate or bridge traffic, which moved generally at less remunerative divisions of through rates than for originated or terminated traffic''; hence, says the witness, remuneration received for traffic is not a proper measure whereby the cost of such movement may be gauged. It is complained by the Railroad Company that in applying to Arkansas the system operation ratio in order to obtain intrastate operating expenses, there is the erroneous assumption that Arkansas net ton-mile revenue rate is the same as for the system as a whole, and that the cost to the Company for moving a ton of freight one mile is greater in Arkansas than the overall average.

It is then said that long heavy grades peculiar to Arkansas and not a factor in other states has been considered. From Neal Springs, north to Rich Mountain in this State,—a distance of seventy-six miles, there is a climb of about 1,500 feet, the greater part of the grade being 1.35%. Where the railroad crosses into Arkansas at the northwest entrance there is an elevation of 500 feet in twenty-nine miles. The only other comparable grades are those encountered north of the Arkansas-Missouri line where for a distance of ten miles the average is 1.80%.

When asked how he arrived at the conclusion that operating costs were greater in Arkansas than the system average, Anderson replied that it came about partly by reason of the Full Crew Law,[2] heavier grades than in other states, and ''less terminal expenses in Arkansas.''

The second deficiency assessment relates to the Company's method of computation in apportioning to Arkansas $212,303 of a system total of $1,031,670.26 paid as hire

---

[2] Act 116, approved March 28, 1907, Pope's Digest, Secs. 11155-56. [See *Kansas City Southern Railway Co.* v. *State*, 116 Ark. 455, 174 S. W. 223.]

for freight cars. The basis adopted by the Company was that of freight car expense mileage to system—20.58% of the gross amount. The Commissioner's auditors made their computations upon the basis of 16.95%—revenue ratio—with the result that Arkansas' proportionate charge would be $174,856.25, or $37,446.75 less than that fixed by the Company.

While insisting that the method of computations made by Company accountants was fairer than that established by Arkansas law, and mentioning heavy grades, disproportionate income from freight, and correspondingly higher costs for handling, the Company readily admitted it did not have figures available to show how much greater these costs would be by reason of some of the factors mentioned. An exception—an instance where generalities gave way to a total item—was the charge made to Arkansas on account of the Full Crew Law. This, said Anderson, entailed an added burden of $50,577.85. No other state in which the Company operates requires a full crew: that is, a fireman, engineer, conductor, and three brakemen where the freight train consists of as many as twenty-five cars and the Company operates not less than fifty miles of railroad.

This added cost, it is insisted, is peculiar to Arkansas, and the Company's system gains nothing because of the requirement that an extra brakeman must be supplied.

The Company's Exhibit No. 1 shows that its main line enters Arkansas east of the southwest corner of Missouri. The direction from Kansas City is slightly west of south to a point between Siloam Springs and Watts, where the State line is crossed and Oklahoma is entered. The road then runs through Oklahoma to a point between Plummer in that state and Howard, Ark., where it again enters this State. A branch from Spiro, Okla., goes to Ft. Smith, Ark. Continuing south from the boundary between Plummer and Howard the line goes to Ogden, Ark., then into Oklahoma, and remains on that side of the boundary until a point south of Bloomburg, Texas, is reached and a small portion of the southwest

corner of Arkansas is traversed before the line enters Louisiana south of Ravanna.[3]

It is a matter of common knowledge that railway crews operate between fixed divisions. These are not shown on any of the maps, nor does evidence touch this point. Result is that the crews required by Act 116 of 1907 are not used exclusively in this State, but ordinarily perform services on the entire division they travel, and are not changed until convenience of the substitution requires it. One extra brakeman is assigned to trains of twenty-five cars or more. Appellee's report to Interstate Commerce Commission, copy of which is required by law to be filed with the Arkansas Public Service Commission, shows (Item 401, Account 720) that for 1941 total payment to trainmen in Arkansas freight service was $167,-894. This is one of the items entering into the total of $2,239,472.46 representing Arkansas' proportion of operating expenses; and, of course, it is a *prima facie* showing that the overall cost for trainmen was the amount officially reported. Yet, according to Anderson's testimony, it would seem that $50,577.85 of $167,894 (or slightly more than thirty per cent. of the total) was incurred by the requirement that one extra brakeman be used.

Reference had been made to an operating ratio of 68.06% as distinguished from the Company's claim of 68.96%. Account No. 720 where the charge of $167,894 for trainmen is found, shows the grand total of operating expenses apportionable to Arkansas to be $2,210,869, and *not* $2,239,472.46 as testified by Anderson. But the explanation is that the *1942* operating ratio of $3,794.353 (76.92%) was subject to " . . . the State proportion of adjustment on Federal [income tax] return for *1941*, $2,210,869." Assuming that by some bookkeeping entry in consequence of which the State's proportionate charge of Federal tax for 1941 was increased, and that in 1942 an adjustment of accounts resulted, the fact remains that

---

[3] Appellee's Exhibit "A," "Kansas City Southern & Louisiana and Arkansas Lines" does not distinctly show in all cases where the state lines are crossed. Reference is had to a profile map, attached to the transcript as an exhibit at p. 72.

this entry of $28,603 was not part of the *operating* expenses utilized in arriving at the ratio of 68.06%. This differential of .88-plus per cent., multiplied by the apportionable Arkansas revenue of $3,248,596, is equal to $28,603.

Illustrating appellee's attitude in taking credit in all instances where a particular ratio worked to its advantage, and in adopting a different method when the result would be to its disadvantage, attention might be called to the frankness with which the witness Anderson disposed of the State's contention that the Act of 1929 should control. He said: "We purposely and intentionally disregarded requirements of the Arkansas statute in filing our returns because we felt that our formula was more nearly correct than the formula provided by law."

An action brought in the United States District Court for the Western District of Oklahoma involved principles similar to those presented by the instant appeal. Trustees for Chicago, Rock Island and Pacific Railway Company brought an action against the Oklahoma Tax Commission to recover additional state income taxes which had been paid under protest for the years 1941 and 1942. The District Court, without a jury, found in favor of the Commission. The Circuit Court of Appeals for the Tenth District affirmed. *Fleming et al. v. Oklahoma Tax Commission*, 157 F. 2d 888. Certiorari was denied by the United States Supreme Court, 329 U. S. 812, 67 S. Ct. 634.

The Court of Appeals said that the Commission treated the Railroad as a unitary enterprise and allocated the net system income according to the formula provided by the Oklahoma law, employing three factors in the allocation. The trial court concluded as a matter of law that the three statutory arithmetical factors were not unreasonable or arbitrary in the absence of affirmative proof to the contrary, and that the Railroad had failed to show that employment of the applicable methods was arbitrary. The very nature of a vast interstate transportation system, said the appellate court, brings it especially within the concept of a unitary system. "A

railroad", said Judge HUXMAN, "may well be likened to a spider's web, in which all of the strands are necessary to the common design and each contributes its necessary part to a single goal. . . . In a long line of cases the [U. S.] Supreme Court has recognized the right of a State to value the property of a unitary enterprise, including railroads, as a unit, and apportion to the state its fair ratable portion of such value by methods fairly tending to reflect its ratable portion of such unit value. . . . Mathematical exactness in allocating system value is impossible of attainment. Any method will contain imperfections".

Weeks might be spent checking calculations found in the Railroad Company's report to Arkansas Public Service Commission and comparing these figures with abstract or explicit statements made by Anderson in attempting to show that the formula used by the Commissioner's auditors was unfair, hence arbitrary and discriminatory. It is said that in apportioning to Arkansas 20.58% of the total cost of rented cars, account must be taken of the system showing of the proportion in miles that rented cars were used in this State. This is purely arbitrary and does not disprove the Commissioner's right to apply the lower figure—16.95%, or the revenue ratio. Many of these cars were oil tankers sent to the Louisiana and Texas fields as empties and there loaded for dispatch to undisclosed destinations. Whether these were large or small cars, whether the revenue load in proportion to weight or mileage was greater than it would have been if a different build or size of car had been used—these factors are not shown and cannot be found in the record.

In the system of accounting, Arkansas Western Railway Company made its own income tax return to the Commissioner, showing a net loss of $30,012.36 for 1941, $25,307.41 being apportionable to Arkansas. How, and to what extent, business originating on Arkansas Western entered into appellees computations is not disclosed.

A mere glance at the map filed as apellee's Exhibit "A" will readily impress an observant person with the interdependence of the so-called unitary system.

No method of accounting could show with even reasonable exactness what part, let us say, of a fifty-car train moving from Texarkana to Kansas City, or from Westville to Joplin, represented revenues apportionable to Arkansas under the Company's accounting methods; nor is the cost of operating such a train satisfactorily explained on a ratio basis. Car mileage figures included in appellee's computations may in some instances include entire trains of empty tankers en route to the Louisiana or Texas oil fields, but on the return or "pay" trip these same cars may be routed from Port Arthur, Beaumont, or other points without again touching the system's lines in Arkansas; yet the rentals would, according to the Company's methods, be disproportionately charged to Arkansas on a car-mile basis when in truth cars were moved over rails in this State to increase the system's ability to earn elsewhere.

We do not share appellee's belief that because Arkansas requires a full crew in handling freight trains of 25 cars or more the system as a whole is discriminated against. The requirement is a legislative declaration of public policy, a safety measure thought necessary to insure the expeditious handling of long trains. Heavy grades and use of additional fuel, and sometimes an extra engine,—these are matters peculiar to the transportation territory entered by the Company for development and service. Tracks in Arkansas are essential to the remainder of the system, and there is no scientific or mathematically accurate way of determining exactly how much or how little in a relative sense the Arkansas trackage contributes to Kansas City Southern as a whole. We must conclude, therefore, that the Company has not sustained its burden of proving the Act discriminatory; nor has its property been taken without due process of law.

The decree is reversed, with judgment here for the Commission.