R. L. QUALLS, Director DEPARTMENT OF
FINANCE AND ADMINISTRATION, State of Arkansas *v.*
MONTGOMERY WARD & CO., INC.

78-35                                       585 S.W. 2d 18

Opinion delivered July 2, 1979
[Rehearing denied September 4, 1979.]

210

*Robert G. Brockmann, James R. Eads, Jr., Joseph V. Svoboda, Barry E. Coplin* and *Thomas Clark, Jr.,* by *Jack East III,* for appellant.

*William D. Dexter,* Olympia, Wash., for *amicus curiae* (for appellant) Multistate Tax Commission.

*Richard A. Williams* and *Eugene G. Sayre* of *Williams, Selig, Overbey & Sayre,* for appellee.

*George W. Koch,* Washington, D.C. for *amicus curiae* (for appellee) Committee on State Taxation of Council of State Chambers of Commerce.

JOHN A. FOGLEMAN, Justice. This case involves the very complex problem of apportionment of income of a multi-state corporation for purposes of income taxation in the various states in which the corporation does business. Montgomery Ward & Company, Inc., is an Illinois corporation. Its corporate headquarters and principal place of business are in Chicago, Illinois. Its primary business is sale of a wide range of merchandise at retail outlets located in all but one of the states of the United States. It is qualified to do, and, during the years involved, did, business in Arkansas through retail stores, catalog stores, and catalog agency stores. It derives income from interest on loans made by it to its subsidiary, affiliate, parent and related corporations. On its corporate income tax returns to the State of Arkansas for its fiscal years ending February 2, 1972, January 31, 1973, and January 30, 1974, Ward deducted this interest income from its nationwide income before computing income tax due the State of Arkansas pursuant to the apportionment provision of the Arkansas version of the Uniform Division of Income for Tax Purposes Act [Ark. Stat. Ann. § 84-2055, et seq. (Supp. 1975 and 1977)].

After agents of the Arkansas Department of Finance and Administration had audited these returns, they disallowed this deduction of interest income and assessed an additional

tax of $26,975.40, not all of which was attributable to this deduction. Ward protested and requested an administrative hearing, which was held before the Arkansas Revenue Department Hearing Board. On May 10, 1976, that board sustained the disallowance of this deduction, but reduced the assessment, because of the allowance of other protested items, to $17,148, which Ward paid under protest. Ward timely filed this suit for a refund in the Chancery Court of Pulaski County, where it was tried on April 5, 1977, and a decree entered on October 19, 1977. This appeal was taken from that decree. Ward has consistently taken the position that it correctly treated this interest as "non-business income," as defined by Ark. Stat. Ann. § 84-2055 (e) (Supp. 1977), and that it should be allocated to Illinois, the state in which its principal office is located, for purposes of taxation, pursuant to Ark. Stat. Ann. § 84-2061 (Supp. 1977). Appellant, and his predecessors in office, have, at all times, contended that this interest income, for the years in question, should, for the purpose of taxation, be apportioned among all the states in which Ward did business, pursuant to Ark. Stat. Ann. § 84-2063 (Supp. 1977). The chancery Court agreed with appellee and rendered its decree for refund of the tax paid under protest. We disagree with the chancery court and agree with appellant.

In its complaint, Ward alleged that this interest was "non-business income," as defined by the statute, because it was not an integral part of its regular trade or business operations. In the alternative, Ward asserted that this section violated the due process and equal protection clauses of the Constitution of Arkansas and the Fourteenth Amendment to the Constitution of the United States and the commerce clause of the United States Constitution. The chancery court decided the case without reaching the constitutional questions. It was proper for that court to do this, if it correctly held that the interest was "non-business income." Since the correctness of that holding is appellant's first point for reversal, we approach it first.

The tax was assessed on the basis of a definition of business income now set out in Regulation IV.1(a) of the Arkansas Revenue Department, an agency of the Depart-

ment of Finance and Administration. Pertinent language of that regulation follows:

> In essence, all income which arises from the conduct of trade or business operations of a taxpayer is business income. For purposes of administration of Article IV [of the Multistate Tax Compact], the income of the taxpayer is business income unless clearly classified as nonbusiness income.

> \* \* \*

> \*\*\* Income of any type or class and from any source is business income if it arises from transactions and activity occurring in the regular course of a trade or business. Accordingly, the critical element in determining whether income is "business income" or "nonbusiness income" is the identification of the transactions and activity which are the elements of a particular trade or business. In general all transactions and activities of the taxpayer which are dependent upon or contribute to the operations of the taxpayer's economic enterprise as a whole constitute the taxpayer's trade or business and will be transactions and activity arising in the regular course of, and will constitute integral parts of, a trade or business.

Regulation IV.7(3) also speaks on the subject, viz:

> Interest income is business income where the intangible with respect to which the interest was received arises out of or was created in the regular course of the taxpayer's trade or business operations or where the purpose for acquiring and holding the intangible is related to or incidental to such trade or business operations.

Several examples illustrative of the application of interest income to be treated as business income under Regulation IV.7(3) follow the text of the regulation. None of them specifically cover the interest involved here, but they do include interest on federal income tax refunds, interest on a judgment against a debtor, interest on a special account

maintained to cover workmen's compensation, rain and storm damage, and machinery replacement, interest on temporary investment of funds intended for payment of federal, state and local taxes, interest on funds held pending redemption of money orders and traveler's checks issued by the taxpayer, interest on working capital and extra cash invested in securities, and interest on the proceeds of sale of a subsidiary which are held in an interest-bearing account until utilized.

Litigation related to income taxes is usually complex because of the necessity for tax laws to be drafted in language peculiar to that field of taxation, but broad enough to cover the declaration of legislative intent as to taxable income, deductions, and exemptions. In order to carry out the legislative intent, it is necessary for the General Assembly to adopt statutory definitions of terms used in an effort to minimize differences in interpretations of the legislative intent which would inevitably arise from efforts to apply the usual and ordinary meanings given the statutory words. In a uniform act definitions are, of course, intended to promote uniformity in the application of tax laws.

Dealing with the equitable taxation of a multi-state corporation, enmeshed in a pattern of intercorporate and intracorporate dealings with parents, affiliates and subsidiaries, appears to have been a serious problem to the legislators and administrators and the problem of judicial interpretation of unfamiliar technical language applied to an unfamiliar field becomes the most perplexing of all statutory interpretations. When constitutional issues are involved, the matter is further complicated. An additional problem is the necessity for preserving and promoting uniformity of application of a uniform act in all the states adopting it. See Ark. Stat. Ann. § 84-2073 (Repl. 1977).

There is virtually no dispute about the facts. The real question involved is one of statutory interpretation and the application of that interpretation to the facts. The basic question is whether interest earned on loans and advances by one member of a complex corporate family to its corporate parent, its corporate siblings, and its corporate children, is

business or non-business income, as those terms are defined by statute.

The basic statutory provision involved is a section of Act 413 of 1961, which as amended, is digested as Ark. Stat. Ann. § 84-2055 et seq. (Supp. 1977). The act is the adoption by Arkansas of the Uniform Division of Income for Tax Purposes Act, known as UDITPA. It appears to have been adopted as an effort to bring about uniformity among the states in taxing the income of multi-state corporations and to establish an equitable basis for taxation by avoiding potential duplication of taxing of the same income and by providing for a fair means of assigning taxable income among the states. The particular section is Ark. Stat. Ann. § 84-2055 (a), defining business income. Appellant contends that the interest in question is business income to Ward and that it should be apportioned among the states in which Ward does business, in the same manner as Ward's other business income. Ward contends, and the chancery court held, that this interest is not an integral part of its regular trade or business and, therefore, is non-business income taxable only in the State of Illinois. The answer requires us to interpret § 84-2055 (a) and apply it to the facts. The pertinent part of that section reads:

> "Business income" means income arising from transactions and activity in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations. ***

Non-business income is all income other than business income as above defined. Ark. Stat. Ann. § 84-2055 (e) (Supp. 1977).

The method of assigning income among the various states under UDITPA involves a three-factor apportionment formula. This formula involves a determination of three ratios, based upon property, payroll and sales. Insofar as Arkansas and Ward are concerned, the ratios are determined by dividing the particular factor, as it relates to Arkansas, by

Ward's total for that factor. For example, Ward's total sales in Arkansas divided by Ward's total sales produces one factor. When each of the factors is determined, they are averaged by adding them and dividing by three. The taxpayer's net business income is then multiplied by the resulting fraction and the result is the amount of Ward's income which is subject to income tax in Arkansas. Non-business income is not apportioned, but is *allocated* to a certain state under the provisions of the act. Interest is one of the types of income from intangibles allocated to the domicile of the corporation, i.e., Illinois, in this case. The fact that the interest income may have been actually earned entirely within the state of Illinois is not controlling, if it is indeed business income under the statutory definition. The entire statutory apportionment formula involves items which are otherwise unrelated to Arkansas. In order to determine the net income to which is applied the Arkansas fraction resulting from the three-factor formula, deductions were made from the income shown on Ward's federal income tax returns, after the interest income involved here had been eliminated. These deductions include such items as interest expense of Ward paid for the use of funds borrowed for general business purposes. No money has been borrowed by Ward for the specific purpose of making loans or advances to affiliates or subsidiaries. Some of the interest expense deducted is for interest paid on loans for property acquired in other states. All interest deductible on the federal income tax return was deducted before arriving at the income taxable in Arkansas. The expense of all repairs made in all states in which Ward has facilities is likewise deducted. Bad debts on accounts receivable both within and without Arkansas are also deducted. Nationwide depreciation and amortization are other such deductions.

There was no activity in Arkansas in relation to the loans and advances from which the interest in question was derived. The financial department of the office of Ward's treasurer in Chicago is the only department of the company involved. This activity is an insignificant part of the overall activities of Ward. The funds for the loans and advances come from cash available after projection of Ward's own cash needs. Ward's treasurer is responsible for the overall maintenance of Ward's financial position. He reviews all potential dispositions and

acquisitions. Acquiring the interest income was not the purpose for which the loans in question were made and making them was not considered an integral part of the funding of the merchandising operation.

One of the companies to which loans were made was the holding company which owned Ward and three other corporations that do no business in Arkansas. Three others were real estate subsidiaries of Ward whose only function was to hold title to real estate used by Ward in the furtherance of its retail business. None of this real estate is in Arkansas. These subsidiaries and many others are operated at a loss from the standpoint of federal income tax. Among the companies were subsidiaries which sold a major part of their products to Ward. Some of them sold nothing to, and bought nothing from, Ward and have no transactions with Ward other than loans and advances made to them. One of the subsidiaries is a credit corporation that acquiries all accounts receivable of Ward. Ward retains the interest on the accounts but it seems that the finance company purchases the accounts at a discount. It is clear that most of the subsidiaries do no business in Arkansas and are not qualified to do business in Arkansas. None of them have any inventory, employees or physical facilities in Arkansas. There is no evidence that any of them do any business in Arkansas.

The loans and advances were made to meet the cash needs of the affiliates and subsidiaries for their corporate purposes, including acquisition of buildings, current expenses and other legitimate business purposes. It is admitted that it is possible that they are made to fund operating losses.

If some of the subsidiaries which are Ward's suppliers should go out of business, Ward would have to find new suppliers. Ward is interested in the well-being of its holding company and Ward's state and local tax manager testified that it is rather doubtful that Ward would refuse to make a loan to that company. That witness also testified that Ward was indeed interested in keeping the credit company afloat, that it would not be helpful to Ward for its subsidiaries holding title to its real estate to go bankrupt, that it was in the best business interest of Ward that the subsidiary that owned

Ward's executive office building (which it had outgrown) continue in operation. He also testified that pricing policies of the subsidiaries are negotiated with Ward at arms length, just as Ward negotiates with any other supplier. The prices of one subsidiary must be the same for Ward as for other customers in order to avoid violation of anti-trust laws. Ward charges management and operations expenses to its subsidiaries, and either Ward or the holding company approves their budgets. Subsidiaries of Ward cannot expand their operations without Ward's approval and affiliates cannot, without the holding company's approval.

The funds for loans and advances to the related corporations come from Ward's working capital cash. The working capital represents all the liquid assets of Ward that are available in the furtherance of its business. Income earned in Arkansas and other states from retail operations and interest income on trade accounts receivable become a part of the working capital. All funds are put into a general cash reserve to be used as needed and no effort is made to segregate or isolate any of the funds derived from sales in a particular state or from returns on any investments. Loans are made to a related corporation by Ward when that corporation cannot meet its own needs for cash. Ward will supply cash to meet the needs of its subsidiaries as long as it has cash available above its own needs. Loans and advances are made regularly and consistently, and were during the three years in question, with the exception of one or two of the subsidiaries to which single loans were made for property acquisition. The loans are made for varying terms. Some are short term, and at least one is for a term of 20 years.

The "Cash Operations Manager," an employee of the Treasurer's Division of Ward, actually handles the advances to the subsidiaries, and accounts for, manages and services them and records all the advances and payments. The cash funds received as interest income from these loans are commingled with all other general cash funds of Ward, and become a part of Ward's working capital to be used for Ward's general corporate purposes, which may include other loans to subsidiary or affiliated corporations. As a result, money received from this interest income might be used for

payment for advertising in Arkansas, for inventory in Arkansas or payment of salaries in Arkansas; however, no effort is made to identify the flow of cash in this account.

The interest on the loans and advances to corporate relatives is income from intangible property belonging to Ward. Due to the regularity and consistency of these loans and advances, the income arises from transactions and activity in the regular course of Ward's business. In *Champion International Corp.* v. *Bureau of Revenue*, 88 N.M. 411, 540 P. 2d 1300 (1975), the New Mexico Supreme Court defined the phrase "transactions and activity in the regular course of the taxpayer's trade or business" in this section, thus:

> Business deals and the performance of a specific function in the normal, typical, customary or accustomed policy or procedure of the taxpayer's trade or business.

It must be remembered that these transactions are not required to be in the course of Ward's regular trade. It is only required that the transactions be in the "regular course of the taxpayer's trade or business operations." See *McVean & Barlow, Inc.* v. *New Mexico Bureau of Revenue*, 88 N.M. 521, 543 2d 489 (1975).

The acquisition, management and disposition of the working capital most assuredly constituted an integral part of Ward's regular trade or business operation. The use to which the interest was put after it was paid is also of some significance in determining whether it is business income. Its use, just as other working capital is used, also leads to the conclusion that it is business income. *Champion International Corp.* v. *Bureau of Revenue,* supra; *Montgomery Ward & Co.* v. *Commissioner of Taxation,* 276 Minn. 479, 151 N.W. 2d 294 (1967). See also, *Great Lakes Pipe Line Co.* v. *Commissioner of Taxation,* 272 Minn. 403, 138 N.W. 2d 612 (1965), appeal dismissed, 384 U.S. 718, 86 S. Ct. 1886, 16 L. Ed. 2d 881 (1966).

Thus, the interest from the loans and advances clearly constitutes business income as defined in Ark. Stat. Ann. § 84-2055 (a). The fact that Ward's regular trade or business operations do not include money lending is of no significance.

Obviously, the lending of money to Ward's related corporations consists of transactions and constitutes an activity in the regular course of Ward's business. We cannot view these loans and advances as a mere temporary investment of idle cash, as Ward would have us do. Even if they were, any short term investment of these funds pending their eventual use in the course of Ward's regular business operations might well be apportionable. *Sperry & Hutchinson Co.* v. *Department of Revenue*, 270 Or. 329, 527 P. 2d 729 (1974); *Montana Department of Revenue* v. *American Smelting & Refining Co.*, 567 P. 2d 901 (Mont., 1977), appeal dismissed, 434 U.S. 1042, 98 S. Ct. 884, 54 L. Ed. 2d 793 (1978); *Great Lakes Pipe Line Co.* v. *Commissioner of Taxation,* supra.

Appellee relies upon *Western Natural Gas Co.* v. *McDonald,* 202 Kan. 98, 446 P. 2d 781 (1968), to support its contention that the interest in question is not business income. That case is not really pertinent here. The item of income held not to be business income under UDITPA in that case was the gain on the liquidating sale of oil and gas leases actually held in the state of Kansas. The Kansas Supreme Court, however, applied a basic test, not identical, but similar in effect, to that we have, i.e., that the controlling factor was the nature of the particular transaction giving rise to the income. It is said that the transaction and activity "must have been in the regular course of taxpayer's business operations." We would likely agree with the Kansas court that the income was not apportionable, if we were treating the capital gain from a sale of similar assets in liquidation.

Appellee contends that two sentences added to § 84-2055 (a) by Act 529 of 1963 (repealed by Act 1024 of 1979, after this case was submitted) clearly show that there was no legislative intent that interest on its loans to related corporations be included as "business income." Those two sentences read:

Business income shall include any dividends or interest paid to a corporation having its commercial domicile in this state by another corporation provided the recipient owns at least 50% of the outstanding capital stock of the distributing or paying corporation. If the recipient cor-

poration owns less than 50% of the outstanding capital stock of the distributing or paying corporation, such dividends or interest shall be nonbusiness income and shall be allocated and taxed as such.

We cannot agree with appellee. The basic definition of business income remained unchanged. The scope of the term was extended where a corporation, domiciled in Arkansas, and owning 50% or more of the stock of a subsidiary, would be required to include all interest paid to it by that subsidiary as business income, to be apportioned among the states in which the parent corporation did business, if those states had a formula for apportionment of business income. Only if the parent having its commercial domicile in Arkansas owned less than one-half of the stock of the subsidiary would the interest be allocated to Arkansas as non-business income. This does not mean that other states would have to treat such interest income in the same manner. But more importantly, the added sentences were not controlling when the interest arose from transactions and activities in the regular course of the parent's business and was income from money, the acquisition, management and disposition of which constitute an integral part of the parent's regular business operations, unless the interest was paid by a corporation in which the recipient owned less than one-half of the stock. The two sentences added brought into the scope of business income for apportionment purposes, *any* interest from a subsidiary of a parent owning more than 50% of the stock of the former when the transactions and activities from which the interest was earned were not in the regular course of the parent's business, and when the acquisition, management and disposition of the money lent were not an integral part of the parent's business. Those sentences also covered dividends, which are not involved here. The treatment of dividends from related corporations would not necessarily fall within the basic statutory definition of business income and a determination whether they did before these two sentences were added would depend upon the circumstances under which the stock was acquired.

It seems to us that Ward's purpose and intent in making the loans and advances were to assure financial stability and

continued operation of its corporate relatives, most of whom are suppliers of Ward or furnishers of services. Some of these borrowers who are operating at a loss probably would be hard pressed to obtain loans from other sources. Keeping these corporations "afloat" is beneficial to Ward's regular business, conducted in 49 states.

Ward's borrowers, with one possible exception, cannot expand their operations without the approval of either Ward or Ward's parent, which is also Ward's only stockholder. Management and overhead expenses are paid to Ward by its subsidiaries in relation to these loans. This is certainly not a usual or ordinary practice where a loan is made as a temporary investment by the lender. And, finally, the record shows that the loans and advances actually are a part of Ward's regular business operations, if that matters.

We do consider that appellee's emphasis on the fact that not more than 0.4% of its total gross income and only 6% of its interest income came from loans and advances to subsidiaries is not justified. That fact does not seem significant to us. However small the income may be in proportion to Ward's total income does not mean that the transactions and activities giving rise to it were not in the regular course of Ward's business or the money lent not accumulated, managed or disposed of as an integral part of its regular business operations. Integral does not mean indispensable or essential. See *American Smelting & Refining Co.* v. *Idaho State Tax Commission*, 99 Idaho 924, 592 P. 2d 39 (1979).

Ward contends that appellant's refusal to permit Ward and its related corporations to report income on the "combined income" method is inconsistent with his position on those items of interest. It seems to think that requiring this interest to be reported as business income amounts to piercing the corporate veil and identifying all the corporations as if they were one. We cannot agree with this position. In the first place, appellant is not seeking to tax the income of any of the related corporations. It is the nature of the transactions and activity and the source and nature (not the location) of the funds used to make the loans and advances that control, not just the identity of the corporations paying the interest. We

have not treated the business of Ward and its corporate relatives as forming a single "unitary business." Only recently the Supreme Court of Idaho pointed out the appropriateness of making this distinction in *American Smelting & Refining Co.* v. *Idaho State Tax Commission,* supra. That court said:

> * * * Simply because the management, operation and activity of a corporation in which the taxpayer owns stock is not so closely connected with the management, operation and activities of the taxpayer to warrant a combined tax return, does not *ipso facto* mean that the dividends the taxpayer receives from that stock cannot be "income arising from transactions and activities in the regular course of the taxpayer's trade or business" and that the "acquisition, management, or disposition" of the stock does not "constitute integral or necessary parts of the taxpayer's trade or business operations." I.C. § 63-3027 (a)(1). The combined reporting provision and the business income definition serve different purposes, ask different questions and apply different standards. The answer to one does not necessarily imply the same answer to the other.

Appellee makes an attack upon the regulations adopted by the revenue department, i.e., those set out at the beginning of this opinion. It contends that they are being improperly applied retroactively, and that they have never been properly adopted. The latter contention was abandoned in the trial court. We do not base our decision upon these regulations, so we need not consider the objections made by Ward. Our decision is based upon our construction of the applicable statutory provisions. The only significance of these regulations is that they reflect the revenue department's view of the proper application of the statute at the time the assessment was made against Ward.

Since we find the interest in question to be business income, it is necessary that we resolve the issue of constitutionality raised by appellee. Ward contends that taxation of this income is a violation of the due process clause of the Fourteenth Amendment and of the commerce clause of the

United States Constitution. We do not agree. UDITPA, as adopted in Arkansas, enjoys the presumption of constitutionality common to all legislative enactments, which is that it is presumptively constitutional and all doubt as to its validity must be resolved in favor of the act. *Redding* v. *State,* 254 Ark. 317, 493 S.W. 2d 116.

The constitutionality of the concept of formulary apportionment under both the due process and commerce clauses is now well established. See *Moorman Manufacturing Co.* v. *Bair,* 437 U.S. 267, 98 S. Ct. 2340, 57 L. Ed. 2d 197 (1978). The burden is upon the taxpayer to show that a formula such as that used in Arkansas places a burden on interstate commerce in a constitutional sense. *Northwestern States Portland Cement Co.* v. *Minnesota,* 358 U.S. 450, 79 S. Ct. 357, 3 L. Ed. 2d 421, 67 ALR 2d 1292 (1959). See also, *Norfolk & Western Railway Co.* v. *Missouri State Tax Commission,* 390 U.S. 317, 88 S. Ct. 995, 19 L. Ed. 2d 1201 (1968); *Hans Rees' Sons, Inc.* v. *North Carolina,* 283 U.S. 123, 51 S. Ct. 385, 75 L. Ed. 879 (1930). One who attacks such a formula must show by clear and cogent evidence that its use results in extraterritorial values being taxed. *Butler Bros.* v. *McColgan,* 315 U.S. 501, 62 S. Ct. 701, 86 L. Ed. 991 (1941); *General Motors Corp.* v. *State,* 181 Colo. 360, 509 P. 2d 1260 (1973). See also, *Fleming* v. *Oklahoma Tax Commission,* 157 F. 2d 888 (10 Cir., 1946). The taxpayer also bears the burden of showing that application of a formula violates due process. *Hans Rees' Sons, Inc.* v. *North Carolina,* supra. See also, *Cook* v. *Kansas City Southern Ry. Co.,* 212 Ark. 253, 205 S.W. 2d 441, cert. den. 333 U.S. 873, 68 S. Ct. 902, 92 L. Ed. 1150 (1948). Appellee concedes, in its brief, that the question of arbitrariness and unreasonableness of the three-factor formula of UDITPA is not in issue. It contends that inclusion of the interest in question as business income is an attempt at extrastate taxation, prohibited by the due process clause and the commerce clause.

Taxes are imposed on corporations doing business in a state as a pecuniary charge for the protection the state affords them in their operations within the state. *Great Lakes Pipe Line Co.* v. *Commissioner of Taxation,* 272 Minn. 403, 138 N.W. 2d 612 (1965), appeal dismissed, 384 U.S. 718, 86 S. Ct. 1886, 16 L. Ed. 2d 881 (1966); *Southern Pacific Co.* v. *McColgan,* 68 Cal.

App. 2d 48, 156 P. 2d 81 (1945). See also, *Wisconsin v. J. C. Penney Co.*, 311 U.S. 435, 61 S. Ct. 246, 85 L. Ed. 267 (1940). Providing an orderly market in which the taxpayer may do business is sufficient basis. *General Motors Corp.* v. *State,* supra. The limitation on a state's power to tax a foreign corporation is that the measure of the tax must bear some reasonable relation to its doing business in the state. *Southern Pacific Co.* v. *McColgan,* supra; *Wisconsin v. J. C. Penney Co.,* supra; *Hans Rees' Sons, Inc.* v. *North Carolina,* supra. There must be some minimal connection between the activities and the taxing state. *Moorman Manufacturing Co.* v. *Bair,* supra.

Of course, a state may violate the commerce clause when it discriminates against interstate commerce by subjecting it to the burden of multiple taxation to which local commerce is not exposed. *Northwestern States Portland Cement Co.* v. *Minnesota,* supra. *Gwin, White & Prince, Inc.* v. *Henneford,* 305 U.S. 434, 59 S. Ct. 325, 83 L. Ed. 272 (1939); *Gulf Oil Corp.* v. *Joseph,* 307 N.Y. 342, 121 N.E. 2d 360 (1954). A tax levied by a state may run afoul of the due process and interstate commerce clauses, if it is not laid on property, business done, or transactions carried on within the state. *Connecticut General Life Ins. Co.* v. *Johnson,* 303 U.S. 77, 58 S. Ct. 436, 82 L. Ed. 673 (1938); *Gwin, White & Prince, Inc.* v. *Henneford,* supra.

A state does not violate the Fourteenth Amendment when its legislature, faced with the practical impossibility of allocating specifically the profits earned by a corporation engaged in interstate commerce through processes conducted within the borders of that state, adopts a method of apportionment that reaches, and was meant to reach, only the profits earned within the state. *Underwood Typewriter Co.* v. *Chamberlain,* 254 U.S. 113, 41 S. Ct. 45, 65 L. Ed. 165 (1920). See also, *Gwin, White & Prince, Inc.* v. *Henneford,* supra.

The entire net income of a corporation generated by interstate, as well as intrastate, activities may be fairly apportioned among the states for tax purposes by a formula utilizing in-state aspects of interstate affairs without violating either the due process or commerce clauses of the United States Constitution. *Northwestern States Portland Cement Co.* v.

*Minnesota,* supra; *Butler Bros. v. McColgan,* supra. See also, *Gwin, White & Prince, Inc. v. Henneford,* supra.

Net income from the interstate operations of a foreign corporation may be subjected to state taxation, provided the levy is not discriminatory and is properly apportioned to local activities within the taxing state, forming sufficient nexus to support the same, without violating either the due process or commerce clauses of the United States Constitution. *Northwestern States Portland Cement Co. v. Minnesota,* supra; *Wisconsin v. J. C. Penney Co.,* supra; *Gulf Oil Corp. v. Clayton,* 267 N.C. 15, 147 S.E. 2d 522 (1966); *American Smelting & Refining Co. v. Idaho State Tax Commission,* supra. See also, *Cook v. Kansas City Southern Railway Co.,* supra; *Roadway Express, Inc. v. Director, Division of Tax,* 50 N.J. 471, 236 A. 2d 577 (1967), appeal dismissed, 390 U.S. 745, 88 S. Ct. 1443, 20 L. Ed. 2d 276 (1968); *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 97 S. Ct. 1076, 51 L. Ed. 2d 326 (1977). Cf. *Hans Rees' Sons, Ins. v. North Carolina,* supra.

Not only must there be some minimal connection between the business activities generating the income and the taxing state, the income attributed to the state for taxing purposes must be rationally related to values connected with the taxing state. *Moorman Manufacturing Co. v. Bair,* 437 U.S. 267, 98 S. Ct. 2340, 57 L. Ed. 2d 197 (1978). The mere fact that the demand of the tax exaction is contingent upon events brought to pass outside the state does not destroy the nexus between the tax and transactions within the state for which the tax is an exaction. *Wisconsin v. J. C. Penney Co.,* supra.

The three-factor formula (or another quite similar) has been held to be constitutional in that it does not violate either the due process clause or the commerce clause of the Constitution of the United States. *Oklahoma Tax Commission v. Southwestern Bell Telephone Co.,* 396 P. 2d 500 (Okla., 1964); *Great Lakes Pipe Line Co. v. Commissioner of Taxation,* supra; *Walgreen Co. v. Commissioner of Taxation,* 258 Minn. 522, 104 N.W. 2d 714 (1960). See also, *Butler Bros. v. McColgan,* supra. The mere fact that application of the formula may result in some overlapping of measures of net income among states is

not fatal. *Great Lakes Pipe Line Co.* v. *Commissioner of Taxation,* supra; *General Motors Corp.* v. *State,* 181 Colo. 360, 509 P. 2d 1260 (1973); *Moorman Manufacturing Co.* v. *Bair,* supra; *American Smelting & Refining Co.* v. *Idaho State Tax Commission,* supra; *Walgreen Co.* v. *Commissioner of Taxation,* supra. See also, *Southern Pacific Co.* v. *McColgan,* 68 Cal. App. 2d 48, 156 P. 2d 81 (1945). It is not necessary that a state demonstrate that an apportionment formula results in exact measure in order to avoid transgression of the due process and commerce clauses. *Norfolk & Western Railway Co.* v. *Missouri Tax Commission,* 390 U.S. 317, 88 S. Ct. 995, 19 L. Ed. 2d 1201 (1968). See also, *Hans Rees' Sons, Inc.* v. *North Carolina,* supra. Mathematical exactness is impossible and any method of apportionment will contain imperfections. *Fleming* v. *Oklahoma Tax Commission,* 157 F. 2d 888 (10 Cir., 1946).

In considering the validity of a state's apportionment formula in the light of the prohibition against a state's burdening interstate commerce, the United States Supreme Court has recognized the practical impossibility of a state's achieving a perfect apportionment of expansive, complex, multi-state business activities, and finds a rough approximation, rather than precision, sufficient. Unless it is demonstrated that an apportionment formula which includes consideration of interstate and out-of-state transactions in relation to the intrastate privilege of doing business produces a palpably disproportionate result, making it patent that the tax is levied upon interstate commerce, the state's tax law will not be nullified. *International Harvester Co.* v. *Evatt,* 329 U.S. 416, 67 S. Ct. 444, 91 L. Ed. 390 (1947); *Moorman Manufacturing Co.* v. *Bair,* supra; *Gulf Oil Corp.* v. *Joseph,* 307 N.Y. 342, 121 N.E. 2d 360 (1954); *General Motors Corp* v. *State,* 181 Colo. 360, 509 P. 2d 1260 (1973). Cf. *Hans Rees' Sons, Inc.* v. *North Carolina,* 283 U.S. 123, 51 S. Ct. 385, 75 L. Ed. 879 (1930).

In considering the questions of constitutionality, it appears that neither the overall operation of related businesses in different states, unity of ownership of stock in separate corporations engaged in related business, nor business transactions between related corporations, creates the required integration of business operations to justify a state claiming a proportionate share of income earned

through foreign sources. See, *Square D. Co.* v. *Kentucky Board of Tax Appeals,* 415 S.W. 2d 594 (Ky., 1967), and cases cited therein. We are dealing, however, with an entirely different situation. Income earned in Arkansas went into Ward's working capital. In the regular course of Ward's business, loans and advances to related corporations earned interest which also went into working capital, a part of which was used to carry on operations in Arkansas. The interest goes into a fund that will be used, in part, in Arkansas, and the supplies and services received from the borrowers contribute to the conduct of Ward's business in Arkansas. These facts provide the necessary nexus, not to justify taxation of the total amount of this interest income, but to justify taxing that portion attributable to Arkansas under the three-factor apportionment formula.

A fundamental part of appellee's argument that the essential nexus with this state for taxation is lacking is its contention that the loans are the investment of temporarily idle funds. We have already disposed of that contention. It seems to us that appellee's argument must fall with the basic premise of its argument. This interest involved was earned on principal which was derived, in part, from earnings in Arkansas.

Arkansas is not taxing the interest income from these loans and advances as such. It is simply included in the apportionable business income. Neither is Arkansas seeking to tax income of Ward derived outside its regular course of business or from investments totally unrelated to its regular business operations. The income tax is not levied on the particular business activity of the multi-state corporate taxpayer carried on within the borders of Arkansas. It is levied on the percentage of the taxpayer's business income from all its business activity apportioned to Arkansas under the three-factor apportionment formula. This does not violate due process constitutional requirements. *Champion International Corporation* v. *Bureau of Revenue,* 88 N.M. 411, 540 P. 2d 1300 (1975). See also, *Southern Pacific Co.* v. *McColgan,* 68 Cal. App. 2d 48, 156 P. 2d 81 (1945).

It is quite true that there is some risk of double taxation

in the "business income" definition of UDITPA, but the formula is designed to avoid that risk and the risk would be eliminated if all states used the three-factor apportionment formula and applied it uniformly. *GTE Automatic Electric, Inc. v. Allphin*, 68 Ill. 2d 326, 12 Ill. Dec. 134, 369 N.E. 2d 841 (1977). There seems to be no significant possibility that Illinois will not consider that this income is apportionable. Such minimal risks are not fatal, because neither the due process clause nor the commerce clause requires total precision in multi-state taxation. *Moorman Manufacturing Co.* v. *Bair*, 437 U.S. 267, 98 S. Ct. 2340, 57 L. Ed. 2d 197 (1978); *American Smelting & Refining Co.* v. *Idaho State Tax Commission,* supra; *General Motors Corp.* v. *State*, 181 Colo. 360, 509 P. 2d 1260 (1973).

We find that the interest on Ward's loans and advances from its working capital to its corporate relatives constitutes business income, as defined by Ark. Stat. Ann. § 84-2055 (a), and that the act, as thus construed and applied, does not violate either the due process clause or the commerce clause of the United States Constitution.

The decree is reversed.

We agree. HARRIS, C.J., GEORGE ROSE SMITH and HOLT, JJ.