Ray S. JAMES, Director of
Revenue, Appellant,

v.

INTERNATIONAL TELEPHONE &
TELEGRAPH CORP., et al.,
Respondent.

No. 63735.

Supreme Court of Missouri,
En Banc.

Aug. 16, 1983.

John Ashcroft, Atty. Gen., Jay Daugherty, Steven H. Akre, Asst. Attys. Gen., Jefferson City, for appellant.

Rene L. Basile, Barbara E. Boettcher, New York City, Raymond E. Shane, St. Louis, for respondent.

WELLIVER, Judge.

The issue in this case is whether long-term capital gains income of respondent

International Telephone & Telegraph Corporation (ITT) from the divestiture of four ITT subsidiaries pursuant to a consent decree constitutes "business income" or "nonbusiness income" for purposes of income allocation and apportionment pursuant to § 32.200, art. IV, RSMo 1969.[1]

## I

ITT is a Delaware corporation authorized to do business in Missouri. The original ITT parent corporation and its direct subsidiaries engaged in the manufacture and sale of electronics and telecommunications equipment and other goods. Among its products are switching systems, private telephone and telegraph exchanges, answering and recording equipment, microwave radio systems, mobile communications equipment, and industrial heating and ventilation equipment. ITT now operates in more than sixty countries and employs approximately 400,000 persons.

ITT conducts business in Missouri primarily through its Blackburn Division in St. Louis, which manufactures and sells electrical connectors, grounding devices, and other electrical hardware for electrical utilities and contractors.

During the 1960's ITT instituted a corporate acquisition program in order to complement its existing business structure through diversification, stabilization of profits, and maintenance of a high level of profits for the ITT group as a whole. By 1977 ITT had approximately 1,000 subsidiaries, 400 of which were in the United States. The corporations that ITT acquired engaged in five general areas of business: telecommunications, engineered products, consumer products, natural resources, and insurance and finance. Each subsidiary operated independently of ITT, although for a fee, which ITT reported as income, ITT performed accounting, tax, and other services for some of the smaller subsidiaries. Employees of ITT sat on the boards of directors of some of the subsidiaries, but there were no interlocking directorates among corporations in the ITT group.

ITT's acquisition of the Hartford Fire Insurance Company in 1970 resulted in an antitrust suit against ITT by the United States Department of Justice. The suit was settled in 1971 with the entry of a consent decree by which ITT agreed to a scheduled divestiture of several of its subsidiaries in return for dismissal of the antitrust action. ITT settled the suit in order to prevent protracted and costly litigation, assure certainty in the retention of corporate acquisitions, avoid adverse publicity, and eliminate problems with the Department of Justice.

Pursuant to the consent decree ITT sold its stock in Avis Company and Hamilton Life Insurance Company in 1972 and its stock in Avis Corporation and Canteen Corporation in 1973. Those sales produced long-term capital gains for ITT, income that ITT's accountants treated as "extraordinary" because it was not related to the corporation's regular business income. Consequently, ITT treated the income as "nonbusiness income" on its Missouri income tax returns for 1972 and 1973. "Nonbusiness income" is taxable only in the state of the taxpayer's commercial domicile, the principal place from which its business is managed, and in this instance the capital gains would not be taxable in Missouri because ITT's commercial domicile is New York. See § 32.200, art. IV, §§ 1(1)–(2), –(5); 6(3). ITT included the gains from the divestiture on its New York franchise tax return.

The Department of Revenue audited ITT's Missouri income tax returns for 1972 and 1973 and, on the basis of those audits, assessed against ITT additional income tax

---

1. A taxpayer whose income is subject to apportionment could, and still may, apportion that income by using either the three-factor formula established in article IV of the Multistate Tax Compact, § 32.200, art. IV, RSMo 1969 (now codified in RSMo 1978), or the single factor formula established in § 143.040, RSMo 1969 (current version at § 143.451, RSMo 1978). In this case ITT chose to apportion its income pursuant to the three-factor formula.

Henceforth all statutory references are to RSMo 1969 unless otherwise indicated.

and interest of $16,876.47 for 1972 and $63,-735.79 for 1973, an aggregate of $80,612.26. ITT petitioned for a formal hearing, after which the Director of Revenue affirmed the assessment. The Director reasoned that corporate growth is a basic business purpose, that the acquisition and management of subsidiaries was a regular part of ITT's business, and that as a result the income in question was earned in the regular course of ITT's business.

The State Tax Commission reversed the Director and held that the disputed income was not taxable in Missouri because it "did not arise from a transaction in the regular course of [ITT's] trade or business." The Director appealed the Commission's decision to the circuit court, which affirmed the Commission on the ground that its decision was supported by competent and substantial evidence upon the whole record. *See* § 536.140(2)(3), RSMo 1978. From that decision the Director appeals. We have jurisdiction because the case involves construction of the Missouri revenue laws. Mo. Const. art. V, § 3. We affirm.

## II

"Business income" for purposes of income apportionment under § 32.200 is defined as "income arising from transactions and activity in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations." § 32.200, art. IV, § 1(1).[2] The current revenue regulations attempt to elucidate this general definition by. explaining that

> [i]ncome of any type or class and from any source is business income if it arises from transactions and activity occurring in the regular course of a trade or business. Accordingly, the critical element in determining whether income is "business income" or "nonbusiness income" is the

identification of the transactions and activity which are the elements of a particular trade or business. In general all transactions and activities of the taxpayer which are dependent upon or contribute to the operations of the taxpayer's economic enterprise as a whole constitute the taxpayer's trade or business and will be transactions and activity arising in the regular course of, and will constitute integral parts of, a trade or business.

12 C.S.R. 10–2.075(4) (1977).

The question we must decide is whether the capital gains from the sale of the four subsidiaries constitute taxable "business income." The Director contends that the acquisition of subsidiaries forms an integral part of ITT's business operations, that such acquisitions contribute to the economic welfare of ITT as a whole, and that "if the income is connected with . . . activities constituting part of the integrated overall business of the taxpayer, the income is business income subject to apportionment." The general language of the statute is certainly broad, and the regulation purports to expand it even further. We do not believe, however, that it can legitimately be read as broadly as the Director urges.

State taxation of income earned by businesses operating in interstate commerce is necessarily circumscribed by due process constraints. A state may not, consistent with due process, tax income earned outside its borders unless there is "a 'minimal connection' or 'nexus' between the interstate activities and the taxing State, and 'a rational relationship between the income attributed to the State and the intrastate values of the enterprise.'" *Exxon Corp. v. Department of Revenue,* 447 U.S. 207, 219–20, 100 S.Ct. 2109, 2117–18, 65 L.Ed.2d 66 (1980) (quoting *Mobil Oil Corp. v. Commissioner of Taxes,* 445 U.S. 425, 436–37, 100 S.Ct. 1223, 1231, 63 L.Ed.2d 510 (1980)). The first tail of this bifurcated test, the nexus requirement, concerns "whether the state has given anything for which it can

---

2. "Nonbusiness income" is conversely defined as "all income other than business income."

§ 32.200, art. IV, § 1(5).

ask return." *Wisconsin v. J.C. Penney Co.,* 311 U.S. 435, 444, 61 S.Ct. 246, 249, 85 L.Ed. 267 (1940). In reality there are two distinct nexus requirements: first, there must be a connection between the taxpayer and the taxing state; second, the out-of-state income sought to be taxed must bear a sufficient relationship through the taxpayer to the taxing state. The first nexus requirement is satisfied "if the corporation 'avails itself of the "substantial privilege of carrying on business" within the State.'" *Exxon,* 447 U.S. at 220, 100 S.Ct. at 2118 (quoting *Mobil,* 445 U.S. at 437, 100 S.Ct. at 1231). The second nexus requirement finds expression in the unitary business principle, "the linchpin of apportionability in the field of state income taxation." *Mobil,* 445 U.S. at 439, 100 S.Ct. at 1232. States may legitimately tax income earned outside their borders "so long as the intrastate and extrastate activities [of the taxpayer form] part of a single unitary business." *Id.* at 438, 100 S.Ct. at 1232. *See also Container Corp. of America v. Franchise Tax Board,* —— U.S. ——, ——, 103 S.Ct. 2933, 2940, 77 L.Ed.2d 545 (1983); *F.W. Woolworth Co. v. Taxation & Revenue Department,* —— U.S. ——, 102 S.Ct. 3128, 3134–35, 73 L.Ed.2d 819 (1982); *ASARCO Inc. v. Idaho State Tax Commission,* —— U.S. ——, 102 S.Ct. 3103, 3109–11, 73 L.Ed.2d 787 (1982); *Exxon,* 447 U.S. at 223, 100 S.Ct. at 2120. For purposes of the unitary business principle, dividends, interest income, and capital gains are treated in the same manner, *AS-ARCO,* 102 S.Ct. at 3116, because "[o]ne must look principally at the underlying activity, not at the form of investment, to determine the propriety of apportionability," *Mobil,* 445 U.S. at 440, 100 S.Ct. at 1233. The second tail of the bifurcated test, the "rational relationship" requirement, prevents a state from unfairly attributing to itself a portion of the taxpayer's income that is "in fact 'out of all appropriate proportions to the business transacted in that State,' . . . or has 'led to a grossly distorted result,' . . . ." *Container Corp.,* —— U.S. at ——, 103 S.Ct. at 2942 (quoting *Mooreman Manufacturing Co. v. Bair,* 437 U.S. 267, 274, 98 S.Ct. 2340, 2345, 57 L.Ed.2d

197 (1978)). *See also Exxon,* 447 U.S. at 223, 100 S.Ct. at 2118.

The Director does not dispute these fundamental principles. Instead he contends that the ITT conglomerate is itself a unitary business—a "unified business with deliberately diversified product lines," one "facet" of which "was conducted in Missouri." He argues that ITT's subsidiaries enhanced ITT's business standing and prestige and precipitated even greater corporate growth; that the earnings of the subsidiaries were commingled with those of ITT, enhancing the total economic structure of ITT; and that the gains from the sales of the subsidiaries were "directly correlated to ITT's calculated growth and production of income through the exercise of business judgment and decisions in the acquisition and management of the subsidiaries."

The State Tax Commission and the circuit court concluded, and we agree, that the record does not support the Director's contention that ITT is in the business of buying and selling subsidiaries. Instead, ITT, like most large corporations, holds investments in a variety of areas in order to solidify its economic base. We therefore have no occasion to consider whether an economic enterprise such as that which the Director postulates could ever constitute a unitary business for purposes of taxation of income earned in interstate commerce. It suffices to say that although "there is a wide range of constitutionally acceptable variations on the unitary business theme," *Container Corp.,* —— U.S. at —— n. 17, 103 S.Ct. at 2947 n. 17, the Supreme Court in three recent cases has rejected the claim that an investment relationship such as the one that exists here constitutes a unitary business.

Idaho argued in *ASARCO* that "intangible income should be considered a part of a unitary business if the intangible property (the shares of stock) is 'acquired, managed or disposed of for purposes relating or contributing to the taxpayer's business.'" It contended that "'[i]t is this integration—i.e., between the business use of the intangible asset (the shares of stock) and ASAR-

CO's mining, smelting, and refining business—which makes the income part of the unitary business.'" *ASARCO,* 102 S.Ct. at 3114. The Court squarely rejected this argument:

> This definition of unitary business would destroy the concept. The business of a corporation requires that it earn money to continue operations and to provide a return on its invested capital. Consequently *all* of its operations, including any investment made, in some sense can be said to be "for purposes related to or contributing to the [corporation's] business." When pressed to its logical limit, this conception of the "unitary business" limitation becomes no limitation at all.

*Id.* In *Woolworth* the Court refused to "trivialize" the due process limitation of the unitary business principle "by holding its satisfied if the income in question 'adds to the riches of the corporation ....'" *Woolworth,* 102 S.Ct. at 3135. The Court said that

> [i]ncome, from whatever source, always is a "business advantage" to a corporation. Our cases demand more. In particular, they specify that the proper inquiry looks to "the underlying unity or diversity of business enterprise," ... not to whether the nondomiciliary parent derives some economic benefit—as it virtually always will—from its ownership of stock in another corporation.

*Id.* (citation omitted).[3] Finally, just last Term the Court in *Container Corp.* emphasized that

> the out-of-State activities of the purported "unitary business" [must] be related in some concrete way to the in-State activities. The functional meaning of this requirement is that there be some sharing or exchange of value not capable of precise identification or measurement—beyond the mere flow of funds arising out of a passive investment or a distinct business operation—which renders formula apportionment a reasonable method of taxation.

*Container Corp.,* —— U.S. at ——, 103 S.Ct. at 2940.

Just as the investment relationship between ITT and the subsidiaries in question does not constitute a unitary business, that relationship is not unitary in the accepted sense. The Director does not dispute that those subsidiaries were not engaged in any aspect of the electronics or telecommunications business. Neither were they engaged in support businesses such as the production or distribution of raw materials or component parts for ITT's manufacturing operations in Missouri. The Avis corporations engaged in automobile renting and leasing, Canteen Corporation engaged in food vending and distribution, and Hamilton Life Insurance Company engaged in the sale of insurance. Thus there was no "functional integration," *Woolworth,* 102 S.Ct. at 3135, either vertical or horizontal, between ITT and any of the subsidiaries in question. *See id.* at 3138–39. *Cf. Exxon,* 447 U.S. at 210, 224, 100 S.Ct. at 2113, 2120 (vertically integrated petroleum business); *Mobil,* 445 U.S. at 428, 439–40, 100 S.Ct. at 1227, 1232–33 (same). There was no real "centralization of management," nor were there "economies of scale." *Woolworth,* 102 S.Ct. at 3135. In short, the subsidiaries were "discrete business enterprise[s]," the business activities of which had "nothing to do with the activities of [ITT] in [Missouri]." *Mobil,* 445 U.S. at 439, 442, 100 S.Ct. at 1232, 1234.

### III

■ In view of the foregoing we must conclude that taxation by Missouri of the capital gains in question would be a viola-

---

**3.** The Court also emphasized that it is immaterial whether income from subsidiaries is commingled with the general funds of the parent corporation and used for general corporate operating purposes. Attaching significance to the commingling of funds, the Court said, would "likewise [subvert] the unitary business limita-

tion," for all income from other corporations "would become part of a unitary business if the test were whether the corporation commingled [income] from other corporations, whether subsidiaries or not." *Woolworth,* 102 S.Ct. at 3135 n. 11.

tion of due process. Those gains therefore cannot be held to constitute taxable "business income" within the meaning of § 32.-200, art. IV, § 1(1),[4] for the statute cannot be construed in a manner that would render it unconstitutional. If there are two possible constructions of a statute, "the one which would uphold its validity will be adopted rather than the one which would defeat it." *Milgram Food Stores, Inc. v. Ketchum*, 384 S.W.2d 510, 514 (Mo.1964), *cert. dismissed*, 382 U.S. 801, 86 S.Ct. 10, 15 L.Ed.2d 55 (1965). *See State Tax Commission v. Administrative Hearing Commission*, 641 S.W.2d 69, 73 (Mo. banc 1982); *Cascio v. Beam*, 594 S.W.2d 942, 946 (Mo. banc 1980); *State Highway Commission v. Spainhower*, 504 S.W.2d 121, 125 (Mo.1973). We hold that the disputed capital gains are not "business income" within the meaning of § 32.200, art. IV, § 1(1) and therefore are not taxable in Missouri. The circuit court did not err in affirming the decision of the State Tax Commission.

The judgment is affirmed.

HIGGINS, BILLINGS and DONNELLY, JJ., concur.

BLACKMAR, J., concurs in result in separate opinion filed.

RENDLEN, C.J., and GUNN, J., concur in result and concur in opinion concurring in result of BLACKMAR, J.

BLACKMAR, Judge, concurring in result.

The State Tax Commission concluded as follows;

> 3.2 The Commission concludes that the income which was realized when Complainant divested itself of certain corporations did not arise from a transaction in the regular course of Complainant's trade or business. Consequently, the income in question was properly allocated by Complainant to its commercial domicile as nonbusiness income.

This conclusion, however labeled, is essentially a finding of fact. Whatever the scope

of review might be under § 536.140, RSMo 1978, the finding appears to me to be fully correct and supported by the evidence. ITT disposed of the subsidiaries under the pressure of a complicated and highly publicized anti-trust suit. The resulting capital gain cannot be properly characterized as "business income." I agree with that portion of Part II of the principal opinion so holding.

Inasmuch as Missouri by its statutes does not purport to tax this nonbusiness income, there is no need to analyze the complicated constitutional issues presented, as further complicated by *Container Corporation of America v. Franchise Tax Board*, —— U.S. ——, 103 S.Ct. 2933, 77 L.Ed.2d 545 (1983).

I concur in the judgment of affirmance.

---

**4.** *See* Hellerstein, *State Income Taxation of Multijurisdictional Corporations, Part II: Re-* flections on ASARCO *and* Woolworth, 81 Mich. L.Rev. 157, 184–86 (1982).