LASSER, P.J.T.C.
Plaintiff, Bendix Corporation (“Bendix”), contests a corporation business tax (N.J.S.A. 54:10A-1 et seq.) deficiency assessment resulting from the addition by the Director, Division of Taxation, of three items of income to Bendix’s income for its fiscal year ended September 30, 1981. Bendix contends that this income was not earned as part of Bendix’s unitary business, and that the Director’s inclusion of these items violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution.
The three items of income which Bendix claims may not constitutionally be included by the Director in the income tax measure of its corporation business tax liability are:
(a) capital gain of approximately $211.5 million realized on Bendix’s sale of its 20.6% stock interest in Asarco, Inc. (“Asarco”);
(b) capital gain of approximately $41.9 million realized on Bendix’s sale of the stock in its wholly-owned subsidiary, United Geophysical Corporation (“UGC”); and
*48 (c) interest of approximately $3.4 million earned on the proceeds of the sale of Bendix’s interest in Asarco and UGC.
In the event the court determines that these items of income are properly includable, Bendix seeks an adjustment of the fiscal 1981 allocation factor in accordance with N.J.S.A. 54:10A-8, contending that the statutory allocation factor used by the Director does not reflect the receipts, payroll or property of Asarco and UGC. Director denies that the assessment is either improper or unconstitutional or that the allocation factor operates unfairly.
I.
In 1981 Bendix[1] was a corporation organized under the laws of the State of Delaware, and had its principal office and commercial domicile at Bendix Center, Southfield, Michigan. Bendix was incorporated in Delaware in 1929 as a manufacturer of aviation and automotive parts.[2]
Over the years, Bendix developed into a multinational corporation with activities, either directly or through subsidiaries or other operating units, in all 50 states and 22 foreign countries. Bendix’s core businesses expanded along several basic lines, so that for the period 1970 to 1981 there were four major Bendix operating groups (the “major groups”): (a) automotive, (b) aerospace/electronics, (c) industrial/energy, and (d) forest products. For operational purposes, the various Bendix subsidiaries or other operating units were included by Bendix in one of the major groups, based on the type of business activity engaged in by that subsidiary or operating unit. Each subsidiary or operating unit had its own management which, in turn, reported to the chief executive of the major group in which the subsidiary or operating unit was included. The chief executives of the *49 major groups reported directly to the chairman and chief executive officer of Bendix.
In 1937, Bendix obtained a certificate of authority to transact business in New Jersey. At all times relevant to this action, it was qualified to transact business in New Jersey, and its New Jersey activities consisted primarily of the operation of several Bendix units in the aerospace group at Teterboro, New Jersey, including aerospace flight systems, guidance systems and test systems, and the manufacture of electric power-generating systems at a plant in Eatontown, New Jersey.
The Bendix Aerospace Flight Systems Division at Teterboro developed and manufactured flight control systems, cockpit displays, flight and engine instrumentation, air data computers, engine control systems, air inlet control systems, pressure and position sensors and transducers, and weapon release and control systems. In addition, supporting maintenance and customer service were provided for all of the manufactured products.
The Bendix Guidance Systems Division at Teterboro developed and manufactured inertial guidance equipment, gyroscopic devices, stabilization and control systems for space programs, and specialized missile and drone equipment.
The Bendix Test Systems Division at Teterboro developed and manufactured complete support systems for analog, digital, microwave and other devices, including the evaluation of test requirements, design and fabrication of test hardware and software, validation of test hardware compatibility, system configuration management, and logistic support of test systems. These three divisions performed their own research, engineering, marketing, accounting and computer services necessary to support their basic manufacturing operations.
Other Bendix aerospace group activities in New Jersey included Bendix computer-aided engineering at Teterboro, which supported the computer-aided engineering requirements of all Bendix aerospace businesses worldwide, and a small Bendix Avionics Division service facility in Morristown, New Jersey, *50 which serviced and supported general aviation customers in central New Jersey.
The Bendix Electric Power Division in Eatontown developed and manufactured complete electric power-generating and control systems, including brushless AC and DC generators, solid-state control and static power conversion equipment, power-control and load-sensing components, electric-starting systems, electric-system test and checkout systems, and other related electric-power system components. This division also performed the research, engineering, marketing, accounting and computer services necessary to support its basic manufacturing operations.
In addition to the activities of Bendix’s Aerospace and Electric Power Divisions, Bendix Field Engineering Corporation, a wholly-owned subsidiary of Bendix, conducted two operations in New Jersey: (1) its Marine Science Services Division at Teterboro provided information to the worldwide ocean-going shipping industry, including ocean current and weather information, and (2) pursuant to a contract with the Federal Environmental Protection Agency (“EPA”), facilities management and maintenance support services were provided at an EPA facility in Edison, New Jersey.
Bendix also sold, both on a wholesale and retail basis, its full range of products to New Jersey customers, and stored inventory in New Jersey at locations owned by others.
II.
Since 1965, Bendix had been pursuing an aggressive policy of growth through acquisition, acquiring approximately 35 companies by 1980. This was part of Bendix’s program of selective acquisitions and divestitures of companies or assets which would enhance Bendix’s existing product areas.
By internal memorandum dated March 31, 1978 to the members of the long-range planning committee, William M. Agee, Bendix’s chairman, stated:
*51 We believe ourselves to be strong enough financially and managerially to warrant several moves aimed at growth and diversification for the 80’s.
° Growth and diversification in the Industrial/Energy area.
° Growth and rebalancing in the forest products area.
° Investment in other basic resources that are now depressed and undervalued but that offer strong profit possibilities for the 80’s.
° Restructuring of Bendix Home Systems with a view to possible withdrawal in the next few years.
This March 31, 1978 memorandum goes on to state: “We have had an acquisition of a mining company in mind for some time because we are bullish on basic resources for the balance of the century.” The memorandum includes a thorough analysis of the copper industry and the qualities that would be desirable for an acquisition candidate, as well as a detailed discussion of a possible acquisition of Asarco.

Asarco.

Asarco is engaged in copper mining and production in the United States and abroad, principally in Latin America. It is also a significant producer of lead, zinc, silver, asbestos, coal and other lesser metals. Asarco also has important equity holdings in Australia, Mexico, Nicaragua, Canada and elsewhere which make significant contributions to earnings.
As stated in an internal memorandum dated April 12, 1978 from Agee to the board of directors, acquisition of Asarco would help Bendix achieve the purposes of its acquisition strategies, which are:
Reducing our dependence on relatively slow-growing aerospace and automotive OEM market.
Broadening our Industrial/Energy Group to give it size and better definition. Generating good cash flow in the early 1980’s to meet growing capital needs, particularly in aerospace/electronics to permit it to hold its own in stiffening markets.
Broadening our holding in basic commodities, particularly forest products and in non-fuel minerals that should prosper from the energy problem or which have other reasons for a strong market position in the 1980’s.
Through a series of purchases between December 1977 and November 1978 from Asarco and others, Bendix acquired 20.6% of Asarco’s stock.
*52 Two seats on the Asarco 14-member board of directors were filled by Agee and an outside director of Bendix. Because Bendix owned at least 20% of Asarco’s stock, it was able to use the equity method of accounting whereby Bendix included its equity share, 20.6%, of Asarco’s total earnings in its income.
During the years that Bendix held its investment in Asarco, the trading price of Asarco’s stock increased, as did its dividend payments. In Bendix’s fiscal 1979, Asarco contributed $.82 a share to Bendix’s total earnings of $7.10 a share. In fiscal 1980, Asarco contributed $2.22 a share to Bendix’s total earnings of $7.68 a share.
In the fall of 1980, Bendix publicly announced that it was considering selling its Asarco stock. Among the reasons given for selling Bendix’s interest were: (1) Bendix had decided to reduce its investment in businesses tied to natural resources, and (2) Bendix’s investment in Asarco had appreciated considerably.
On October 29, 1980, Bendix and Asarco entered into- an agreement under which Asarco agreed to purchase the shares owned by Bendix, at $55 a share. During fiscal 1981, pursuant to an agreement with Asarco to repurchase the shares, Bendix sold its Asarco stock to Asarco at $55 a share for a total sale price of approximately $335,879,500, of which approximately $211,500,000 was the long-term capital gain at issue.

United Geophysical Corporation.

United Geophysical Corporation (“UGC”) was in the business of seismic surveying, which involves the creation of underground acoustical waves through blasting or mechanical means and the recordation and interpretation of the wave patterns for purposes of locating oil and gas. UGC transacted no business in New Jersey. In 1965, Bendix purchased 100% of the stock of UGC.
The purchase of UGC was part of the effort by Bendix to diversify. Bendix’s 1965 annual report to its shareholders states:
*53 We have accelerated our acquisitions program. Here our objective is not merely diversification. We intend to achieve a better balance of our military and commercial-industrial produet sales. We intend to enhance and improve our competence in the fields where Bendix’s leadership and talents are acknowledged by acquiring strong units that are supplementary. In May we acquired United Geophysical Corporation. This well-established organization is active world-wide in providing geophysical services to oil companies. Complementing our substantial oceanics endeavors, this acquisition will enable us to participate more fully in geophysical operations for petroleum and other minerals on a global basis.
From 1965 to 1968, UGC was included in Bendix’s oceanics group. In 1968, the oceanics group was disbanded. Thereafter, UGC was included in Bendix’s industrial/energy group, and in later years the Bendix aerospace group had some oversight over UGC.
During the time that Bendix owned UGC (1965 to 1981), numerous Bendix employees served on UGC’s board of directors or as UGC corporate officers. Certain senior management of UGC was supplied by Bendix. Murray Weingarten was vice-president of operations at Bendix Field Engineering Corporation (“BFEC”) prior to becoming president of UGC in 1967. Bendix transferred Weingarten to UGC because it believed his experience managing BFEC, which like UGC was a service business, might be helpful in operating UGC and addressing certain of UGC’s problems. Under Weingarten, UGC was reorganized. There was a significant reduction in staff, and new personnel policies were initiated.
Bendix approved UGC’s annual financial plan, and Bendix’s board of directors approved UGC’s requests for capital expenditures above a certain dollar limit.
Bendix financed, at approximately $1,000,000 each, the construction of two ships for UGC to be used in marine seismic exploration. The Bendix logo appeared on the ships and other UGC equipment.
Bendix charged UGC, through the intercompany accounts, for services it provided. Among the services Bendix provided were auditing, legal advice, routine legal services, tax advice, *54 tax return preparation, insurance advice, insurance coverage and computer access.
By memorandum dated November 13, 1980 to the board of directors, Agee set forth the reasons for the divestiture of UGC:
[UGC] does not particularly relate to our other businesses regarding technology, marketing or management. Although UGC has been successful, geophysical seismic data acquisitions is a cyclical business. Historical experience indicates that exploration declines during peak periods of development of new oil and gas discoveries. UGC experienced its best year in 1980 due. to the exploration boom caused by energy concerns. This climate has created a high degree of interest in oil and gas exploration, offering an excellent opportunity to divest UGC at a very favorable price.
In July 1981, Bendix sold 100% of the stock of UGC for approximately $80 million, resulting in a long-term capital gain of approximately $41.9 million.

Interest on the proceeds from the sale of Asareo and UGC stock.

In 1981 Bendix placed the proceeds from the sale of its 20.6% interest in Asareo and 100% of UGC in an interest-bearing investment account (the “account”) with Lehman Brothers, Kuhn, Loeb (“Lehman Brothers”). The account was administered, and all securities on deposit were located, outside of New Jersey. The investments in the account were of a highly-liquid nature, generally with maturities of less than 90 days. During fiscal 1981, the Asareo and UGC proceeds in the account earned approximately $3.4 million in interest.
In late January 1981, Bendix made a public offer to purchase up to four million shares of Bendix stock. As reflected in Bendix’s filings with the Securities and Exchange Commission in connection with this offer, the source of funds for the purchase of shares was the proceeds of Bendix’s sale of its interests in Asareo and UGC. Furthermore, the cash proceeds from these sales which took place in fiscal 1981 created the liquidity and additional debt capacity needed to enable Bendix to be in a position to make a sizable acquisition if an appropriate acquisition candidate materialized. On August 24, 1982, *55 Agee requested authorization from the Bendix board to make a public offer to purchase up to 50% of the shares of Martin Marietta, with the intent to acquire the remaining 50% in exchange for Bendix shares. Martin Marietta’s principal business was aerospace related. Bendix had an aerospace group and believed that its business and that of Martin Marietta were complementary.
III.
This case poses the question of whether the State of New Jersey can include in the income base of Bendix, capital-gain income realized by Bendix on the sale of its 20% interest in Asarco and its 100% interest in UGC and the interest income earned from the investment of that capital-gain income. It is helpful at the outset to set forth the observations of the majority of the United States Supreme Court in its most recent decision on the subject. Container Corp. v. Franchise Tax Board, 463 U.S. 159, 103 S.Ct. 2933, 77 L.Ed.2d 545 (1983).
Under both the Due Process and the Commerce Clauses of the Constitution, a State may not, when imposing an income-based tax, ‘tax value earned outside its borders.’ In the case of a more-or-less integrated business enterprise operating in more than one State, however, arriving at precise territorial allocations of ‘value’ is often an elusive goal, both in theory and in practice. For this reason and others, we have long held that the Constitution imposes no single formula on the States, and that the taxpayer has the ‘distinct burden of showing by “clear and cogent evidence” that [the state tax] results in extraterritorial values being taxed ... ’
One way of deriving locally taxable income is on the basis of formal geographical or transactional accounting. The problem with this method is that formal accounting is subject to manipulation and imprecision, and often ignores or captures inadequately the many subtle and largely unquantifiable transfers of value that take place among the components of a single enterprise. The unitary business/formula apportionment method is a very different approach to the problem of taxing businesses operating in more than one jurisdiction. It rejects geographical or transactional accounting, and instead calculates the local tax base by first defining the scope of the ‘unitary business’ of which the taxed enterprise’s activities in the taxing jurisdiction form one part, and then apportioning the total income of that ‘unitary business’ between the taxing jurisdiction and the rest of the world on the basis of a formula taking into account objective measures of the corporation’s activities within and without the jurisdiction. [463 U.S. at 164-165, 103 S.Ct. at 2940; citations omitted]
*56 The Court set forth the requirements for use of the unitary business/formula apportionment method as: (1) a minimal connection or nexus between interstate activities and the taxing state, and (2) the out-of-state activities of the purported unitary business must be related in some concrete way to the instate activities. With respect to the latter, the Court said:
The functional meaning of this requirement is that there be some sharing or exchange of value not capable of precise identification or measurement — beyond the mere flow of funds arising out of a passive investment or a distinct business operation — which renders formula apportionment a reasonable method of taxation. [Id., 463 U.S. at 166, 103 S.Ct. at 2940]
There is no single test to determine whether a business is unitary. As the United States Supreme Court has said, and the New Jersey Supreme Court has echoed, “the unitary business concept is not, so to speak, unitary.” Id., 463 U.S. at 167, 103 S.Ct. at 2941 (quoted in Silent Hoist & Crane v. Director, Taxation Div., 100 N.J. 1, 18, 494 A.2d 775 (1985)). In fact, in Container, the United States Supreme Court refused to say whether any one factor would be sufficient, as a constitutional matter, to prove the existence of a unitary business. Rather, the Court looked at many individual factors taken in combination. Container, supra, 463 U.S. at 179-180, 103 S.Ct. at 2948. A unitary case is thus intensely factual.
Let me first state as firmly as possible that in the subject case we are dealing with the income of Bendix, not the income of Asarco or UGC. The line of cases from Mobil through Container[3] dealt primarily with taxation of income earned by the subsidiary and paid to the parent as dividends. Bendix is a different kind of unitary case. In this case, we are not dealing with subsidiary income paid to the parent as dividends, but with income earned by the parent on the sale of its *57 assets. Therefore, unlike the cases from Mobil through Container, but like the case of Silent Hoist, in this case I must look to the activities of the parent, not those of the subsidiary, to determine whether the income is unitary.
For the purpose of this case, interest and capital gain income of the parent have different consequences for unitary purposes than dividend income from a subsidiary.[4] Although Asarco Inc. v. Idaho State Tax Commission, 458 U.S. 307, 102 S.Ct. 3103, 73 L.Ed.2d 787 (1982) makes reference to capital gain income of the parent, that case dealt primarily with dividend income from the subsidiary, holding that five subsidiaries were discrete entities and the dividend income was not to be included as business income. Although the parties agreed and the Court agreed with the parties that interest and capital-gain income derived from the five subsidiaries should be treated in the same manner as dividend income, the issue of whether interest income and capital-gain income is the same or different from dividend income was not in dispute. Thus, the Court’s acceptance of this treatment is not precedential. See West Milford Tp. v. Garfield Recreation Comm., 194 N.J.Super. 148, 158, n. 11, 476 A.2d 333 (Law Div.1983) citing Illinois State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 183, 99 S.Ct. 983, 989, 59 L.Ed.2d 230 (1979). Notwithstanding the treatment in Asarco, Inc. v. Idaho, interest and capital-gain income of a parent is different from dividend income received from a subsidiary. Dividend income is that portion of the earnings of a subsidiary corporation that it chooses to distribute to its shareholders. Interest and capital-gain income is income earned directly by the parent from the sale or use of the assets of the parent. Thus, conceptually, when determining the unitary issue, the court is justified in looking only at the parent *58 when dealing with capital-gain income, while in dealing with dividend income from a subsidiary the court is justified in looking at the subsidiary and its relation to its parent.
In its analysis of the line of cases from Mobil to Container, the New Jersey Supreme Court, in Silent Hoist & Crane Co. v. Taxation Div. Director, supra, 100 N.J. at 17, 494 A.2d 775 found that Asarco Inc. v. Idaho was modified by Container. The New Jersey Supreme Court commented that, in Container, “the Court appeared resolved to take itself out of the business of being a tax commission and made it clear that the taxpayer has the ‘distinct burden of showing by “clear and cogent evidence” that the [state tax] results in extraterritorial values being taxed.’ ” Id. at 9-10, 494 A.2d 775. The New Jersey Supreme Court stated that the only restraints the United States Supreme Court will impose are to inquire whether the state court applied the correct standard to the case and whether the judgment was within the realm of a permissible judgment.
Although Silent Hoist was a single corporation and Bendix operated through subsidiaries and divisions, the principles of Silent Hoist are applicable to the activities of Bendix, a parent corporation. Both cases deal with investment activity by a corporation with strong centralized management and a corporate strategy that combined operating and investment activity to achieve corporate goals. As stated by the New Jersey Supreme Court, “the focus must be on Silent Hoist’s investment activity and other aspects of its corporate business and the role the investment activity plays in those other activities.” Id. at 19, 494 A.2d 775. It is the corporate activity, not the corporate structure, that should govern the determination of this issue.
The subject of investment activity has been dealt with in Silent Hoist:
As we have seen, Silent Hoist’s investment capital was capable of being pledged, liquidated or converted to other uses of the company sales or real estate operations. To describe this economic power as passive does not reflect economic reality.
The taxpayer would have us divide this investment income from the organic whole of the business enterprise. This is, however, not a matter of constitutional law, but a matter of tax preference. Our job is not to rewrite the State’s *59 Corporation Business Tax but to apply it as intended. New Jersey’s tax policy is quite distinct from the majority of states. We do not seek to allocate non-business income to the place of commercial or legal domicile. On the other hand, we accommodate our tax policy to the modern business complex by specifically excluding all dividends from subsidiaries (at least 80% owned) and 50% of other dividend income.
We are more than satisfied here that there was a distinct sharing of the value of common management, accounting and operations that takes the portfolio income of this taxpayer well within the concept of a unitary business. [100 N.J. at 22-23, 494 A.2d 775; footnote omitted]
The Director concedes that the activities of Asarco are unrelated to those of Bendix. If the court were to look solely to the activities of Asarco, it could conclude that Asarco is itself a discrete entity. However, here, we are dealing with capital-gain income from the sale of Bendix’s minority interest in Asarco, and therefore look to the activities of Bendix, not those of Asarco. The activities in issue are investment activities, and the unitary business question is resolved, as in Silent Hoist, by examining taxpayer’s activities in managing the investment, not the nature of the activities of the subject of the investment.
Viewing the issue in terms of Bendix’s investment activity against the background of the decision of the New Jersey Supreme Court in Silent Hoist leads this court to the conclusion that the investment was an active one, and that the capital-gain income from the investment is unitary and must be included in the income base when applying the formula for apportioning the income of Bendix within and without the State. The Bendhj investment in Asarco was more than passive by virtue of Bendix’s control over the investment and because it was a significant part of the Bendix corporate strategy.
The purchase of a minority share in Asarco was part of a Bendix plan for growth and diversification in the 1980’s which called for investing in depressed and undervalued basic resources to achieve the planned result of a stronger, diversified company. This investment was made only after a thorough analysis of the copper industry and the qualities of specific acquisition candidates. The Asarco investment was part of a well-orchestrated corporate strategy designed to enhance Bendix’s current status, as well as position Bendix for the future. *60 To describe this investment as passive would ignore the New Jersey Supreme Court’s decision in Silent Hoist and disregard economic reality. The determination of the New Jersey Supreme Court in Silent Hoist has set the course for this court to follow.
Bendix relies on the decision of the Supreme Court of Missouri in the case of James v. International Telephone & Telegraph Corp., 654 S.W.2d 865 (Mo.Sup.Ct.1983). In that case, the court held that long-term capital-gain income realized from the sale of four subsidiaries was not “business income” for the purpose of income allocation under the Missouri corporation income tax. Missouri is one of approximately 24 states which have adopted the Uniform Division of Income for Tax Purposes Act (“UDITPA”).[5] States which have adopted UDITPA only apportion business income, which is income related to the taxpayer’s regular course of business. Nonbusiness income, which would include rent and royalties from real or tangible personal property, capital gains, interest, dividends or patent and copyright royalties to the extent they are unrelated to taxpayer’s regular course of business, is taxable only in the state of taxpayer’s commercial domicile. It would appear that in a UDITPA state most investment income would be nonbusiness income and therefore not apportionable in the nondomiciliary state. The James court held that long-term, capital-gain income realized from the sale of four subsidiaries was not “business income” for the purpose of income allocation under *61 the Missouri corporation income tax. Because Missouri is a UDITPA state, it appears that the court would have had to make a finding that the taxpayer was in the business of buying and selling subsidiaries in order to find that the capital gain income from the sale of the subsidiaries was business income. The court concluded that the record did not support that contention of the State of Missouri. Therefore, the Missouri court never reached the question of whether capital gains earned on the sale of a subsidiary is apportionable unitary income where there is a showing of actual planned and controlled corporate investment activity, such as has been shown in the subject case.[6]
There is a significant difference between the James case and this case. In James, the court had to determine whether the capital-gain income was business or nonbusiness income, and made its determination based on the activities of the subsidiaries, not those of the parent. The issue in the present case is not whether the income is business income or nonbusiness income but, as required by the decision of the New Jersey Supreme Court in Silent Hoist, whether the investment activity is active or passive. Following Silent Hoist, this must be determined by considering the activities of Bendix with respect to the investment, not the activities of the subsidiaries in which it invested. I conclude that the holding in James v. ITT is irrelevant to the facts of the present case and that Silent Hoist is not only relevant, but is controlling on this court. Therefore, the inclusion of the subject capital gains and interest income does not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution.
IV.
In accordance with the foregoing reasoning, the capital gain realized by Bendix on the purchase and sale of UGC is also *62 regarded as unitary income from an active investment, as is the income from the proceeds of the Asarco and UGC sales deposited temporarily by Bendix with Lehman Brothers to be held and invested until needed in pursuance of Bendix’s corporate strategy. The funds were actually used shortly after their receipt, to further the corporate purposes of Bendix, consistent with its corporate strategy, in the acquisition by Bendix of its stock and the subsequent use of that stock and the funds in connection with its attempted acquisition of Martin Marietta Co.
It should also be noted that there was substantially more interaction between Bendix and UGC, its 100%-owned subsidiary, than between Bendix and Asarco. However, in considering the capital gain income of Bendix, the court looks to the investment activity of Bendix, not the activity of the subsidiary or its relationship to its parent.
V.
Taxpayer argues that if Asarco and UGC are regarded as part , of Bendix’s unitary business, the allocation formula as applied by the Director should be modified to include the property, sales and payroll of these two companies — Asarco to the extent of 20% and UGC 100%.
The burden is on Bendix to establish that the tax liability is “out of all appropriate proportion to the business transacted” in the taxing state itself. Silent Hoist, supra, 100 N.J. at 10, 494 A.2d 775 (quoting Hans Rees’ Sons, Inc. v. North Carolina ex rel. Maxwell, 283 U.S. 123, 135, 51 S.Ct. 385, 389, 75 L.Ed. 879 (1931)). The court finds that there is no reason to alter the statutory allocation formula in this case because the income is capital-gain income of Bendix, not income of Asarco or UGC, and there is no proof that the result of the statutory allocation formula, which allocates 7.980727% of Bendix’s income to New Jersey, taxes extraterritorial value, or is distorted or unfair.
The Clerk of the Tax Court is directed to enter judgment affirming the fiscal 1981 deficiency tax assessment of the Director.

Bendix became a wholly-owned subsidiary of Allied Corporation in 1983 and was merged into Allied as of April 1, 1985.

The case was submitted to the court for decision on stipulated facts, from which the court’s recital of the facts is drawn.

Mobil Oil Corp. v. Commissioner of Taxes of Vermont, 445 U.S. 425, 100 S.Ct. 1223, 63 L.Ed.2d 510 (1980); Exxon Corp. v. Wisconsin Dept. of Revenue, 447 U.S. 207, 100 S.Ct. 2109, 65 L.Ed.2d 66 (1980); Asarco Inc. v. Idaho State Tax Commission, 458 U.S. 307, 102 S.Ct. 3103, 73 L.Ed.2d 787 (1982); F.W. Woolworth Co. v. Taxation and Revenue Dept. of the State of New Mexico, 458 U.S. 354, 102 S.Ct. 3128, 73 L.Ed.2d 819 (1982); Container Corp. of America v. Franchise Tax Board, 463 U.S. 159, 103 S.Ct. 2933, 77 L.Ed.2d 545 (1983).

Under the New Jersey Corporation Business Tax Act, capital gain income of a parent is subject to tax. N.J.S.A. 54:10A-4(k). Dividends of a subsidiary that is 80%-100% owned are not taxed to the parent, and only 50% of dividends from a subsidiary less than 80% owned are taxed to the parent. N.J.S.A. 54:10A-4(k)(5).

New Jersey has not adopted UDITPA. All unitary income must be reported and is then apportioned to New Jersey under the three-factor formula. There are no statutory provisions permitting specific allocation ("tracing particular property, receipts, or income to their source or other connection with a State and attributing the item in toto to that State,” Hellerstein, State Taxation, I Corporate Income and Franchise Taxes (1983), f 8.4 at 328) or separate accounting (“a technique of carving out of the overall business of the taxpayer the activities taking place, the property employed in, and the income derived from, sources within a single State, and by accounting analysis ascertaining the profits attributable to that portion of the business." Id., j[ 8.3 at 323).
Furthermore, there is no claim by taxpayer of double taxation, and there is no evidence that Michigan, the state of Bendix's commercial domicile, has treated the subject income as nonbusiness income.

I also note that the decision in Asarco, Inc. v. Idaho, supra, on the unitary issue was influenced by the business/non-business income distinction because Idaho is a UDITPA state. See Silent Hoist, supra, 100 N.J. at 22-23, n. 8, 494 A.2d 775.