James C. PLEDGER, Commissioner of Revenues,
Dep't of Finance and Administration,
State of Arkansas *v.*
ILLINOIS TOOL WORKS, INC.

90-242                                     812 S.W.2d 101

Supreme Court of Arkansas
Opinion delivered June 24, 1991

*John Theis, William E. Keadle, Robert L. Jones, Cora Gentry, David Kaufman, Malcolm Bobo, Beth B. Carson,* and *Joyce Kinkead,* by: *Rick L. Pruett,* for appellant.

*Jack, Lyon & Jones, P.A.,* by: *Eugene G. Sayre,* for appellee.

TOM GLAZE, Justice. This tax case addresses for the first time the effect of the "unitary business principle" on Arkansas's Uniform Division of Income for Tax Purposes Act (UDITPA), Ark. Code Ann. §§ 26-51-701 —to— 723 (1987, Supp. 1989). This Act governs how Arkansas imposes its respective corporate and franchise taxes on the earnings of corporations that have multistate and multinational entities. UDITPA is designed to fairly apportion among the states in which a corporation conducts its multistate business a fair amount of value or business income earned by the corporations' activities in each state. Generally, under UDITPA, net taxable "business income" of a corporate taxpayer involved in a multistate business is apportioned upon a well-recognized three factor formula of tangible property, sales, and payroll.

Appellee, Illinois Tool Works (ITW), is a multistate and multinational corporation having a worldwide business in the manufacturing of tools, fasteners, packaging products and the leasing of machinery. ITW has operating divisions in seventeen places in the United States and conducts business in several foreign countries. One of ITW's manufacturing plants is located in Pine Bluff, Arkansas. Its corporate headquarters or "commercial domicile" is in Chicago, Illinois.

ITW determined that, for UDITPA purposes, certain capital gains income it had earned in 1981 through 1983 from six different capital assets was "nonbusiness income;" thus it excluded this income when calculating its allocation of taxes to this state.[1] Instead, ITW allocated the income from the sale of these capital assets to its "commercial domicile," in Chicago and the income was taxed under the Illinois corporate income tax laws. ITW's six capital assets were stock in two Japanese manufactur-

---

[1] We note that there were originally seven capital assets in dispute, but the appellant conceded that income from the sale of preferred stock was "nonbusiness income" under UDITPA.

ing companies, NISCO and NIFCO; stock in Computer Products, Inc.; undeveloped real property located near ITW's headquarters in Chicago; U.S. Treasury Notes and foreign currency transactions.

The appellant, Arkansas Department of Finance and Administration, disagreed with ITW's classification of this income, asserting that the income constituted "business income" for purposes of Arkansas's UDITPA. Accordingly, appellant assessed ITW additional taxes of approximately $45,164 for the years 1981-1983. After losing an appeal in an administrative hearing, ITW paid the additional taxes under protest and appealed to the chancery court.

The chancery court, relying on five United States Supreme Court cases decided in the 1980's, held that the "unitary business principle" must be utilized in determining whether or not intangible income of multistate or multinational corporate taxpayer is to be classified as "business income" or "nonbusiness income" for UDITPA purposes. In applying the principle in this case, the chancellor further concluded that ITW's aforementioned income from the sale of its six capital assets was not taxable by the state because the income was in no way connected with ITW's Arkansas business activities. The appellant appeals from the lower court's holding, arguing that the chancellor misapplied the law and made erroneous findings of fact. We find no error and therefore affirm.

██ Under the UDITPA, "business income" is defined as follows:

> Income arising from transactions and activity in the regular course of the taxpayer's trade or business includes income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations.

Ark. Code Ann. § 26-51-701(a) (Supp. 1989). As we noted previously, all "business income" is apportioned to this state using an established formula. Ark. Code Ann. § 26-51-709 (1987). Also, under the Act, "nonbusiness income" is defined as all income other than "business income," § 26-51-701(e), and is

allocated specifically to the state having the most logical nexus with the asset producing the "nonbusiness income" (usually its "commercial domicile") rather than being apportioned among the states where the corporation conducts its business.

In the mid-1970's, the Revenue Division of the Arkansas Department of Finance and Administration adopted certain corporate income tax regulations to implement the provisions of Arkansas's UDITPA. Arkansas is a member of the Multistate Tax Compact and the regulations it (and other states) adopted were suggested by the Multistate Tax Commission (MTC). These regulations were generally referred to as "full apportionment" regulations because they broadly construed the concept of "business income" and very narrowly construed the concept of "nonbusiness income" for UDITPA purposes.

In *Qualls* v. *Montgomery Ward & Company*, 266 Ark. 207, 585 S.W.2d 18 (1979), this court adopted the "full apportionment" rationale. In *Qualls*, Montgomery Ward received interest from loans made to subsidiary and related corporations none of which were located or did business in Arkansas. Because there was no activity in Arkansas in relation to the loans, Montgomery Ward contended that the interest was "nonbusiness income" taxable in its "commercial domicile" in Illinois. This court disagreed and held that Montgomery Ward's interest income was "business income," not "nonbusiness income," based upon the fact that the interest income was commingled with the company's other general funds to be used for general corporate purposes, which included its business activities in Arkansas.

After the *Qualls* decision, the U.S. Supreme Court changed the "full apportionment" rationale by adding the following two requirements under the Due Process Clause of the fourteenth amendment: 1) a minimal connection or nexus between the interstate activities and the taxing state; and 2) a rational relationship between the income attributed to the state and the intrastate values of the enterprise. *Mobile Oil Corp.* v. *Commissioner of Taxes*, 445 U.S. 425 (1980). The first nexus requirement is met if the corporation avails itself of the substantial privilege of carrying on business within the state. The Supreme Court labeled the second due process requirement, the "unitary business principle," and explained the application as

follows:

> (T)he linchpin of apportionability in the field of state income taxation is the unitary business principle. In accord with this principle, what appellant (taxpayer) must show, in order to establish that its dividend income is not subject to an apportioned tax in Vermont, is that the income was earned in the course of activities unrelated to the sale of petroleum products in that state.

The cases following *Mobil* all cited the above language and utilized the "unitary business principle" analysis. *Exxon Corp.* v. *Wisconsin Dept. of Revenue*, 447 U.S. 207 (1980); *ASARCO, Inc.* v. *Idaho State Tax Comm'n*, 458 U.S. 307 (1982); *F.W. Woolworth Co.* v. *Taxation & Revenue Dept.*, 458 U.S. 354 (1982); *Container Corp.* v. *Franchise Tax Board*, 463 U.S. 159 (1983). Under the "unitary business" rationale, as expressed in these decisions, the general test for determining whether a diversified group of businesses had a "unitary business" relationship was to determine whether the income that the state was attempting to tax resulted from functional integration, centralization of management, and economies of scale utilized by the corporate group.

In response to the Supreme Court cases cited above, the Arkansas Revenue Department adopted Regulation 1984-2, which recognized the Supreme Court's due process limitation but applied the "unitary business principle" only to dividend income. In this appeal, the appellant relies on this regulation to argue that since ITW's capital gains were not derived from dividend income, the income is still taxable. We do not agree with the appellant's reading of these Supreme Court cases as limiting the "unitary business principle" analysis only to dividend income.

In *ASARCO*, the Supreme Court addressed Idaho's argument that dividend income received by ASARCO should be considered a part of a "unitary business" if the intangible property is acquired, managed or disposed of for purposes relating or contributing to the taxpayers' business. The Court rejected Idaho's "full apportionment" argument and held that the dividend income of ASARCO was not taxable by Idaho. In so holding, the Court stated the following:

This definition of unitary business would destroy the concept. The business of a corporation requires that it earn money to continue operations and to provide a return on its invested capital. Consequently, *all* of its operations, including any investment made, in some sense can be said to be "for purposes related to or contributing to the [corporation's] business." When pressed to its logical limit, this conception of "unitary business" limitation becomes no limitation at all.

Although the main dispute in *ASARCO* concerned dividend income, Idaho also attempted to tax certain ASARCO interest and capital gains from stock sales. However, Idaho and ASARCO had agreed that interest and capital gains derived from these sales should be treated in the same manner as the dividend income. The Supreme Court concurred with the parties' agreement, stating that "One must look principally at the underlying activity, not at the form of investment to determine the propriety of apportionability." The Supreme Court then proceeded to hold that Idaho's attempt to tax this other income also violated the due process clauses.

Clearly from reading *ASARCO*, the Supreme court did not intend for the "unitary business principle" to apply to dividend income only. Accordingly, we hold that the chancellor here was correct in applying the "unitary business principle" analysis to the facts of this case. In sum, we believe the appellant's reading of the Supreme Court cases is much too narrow, and those cases in no way can be construed to uphold the constitutionality of appellant's Regulation 1984-2.

We note the appellant's suggestion that the Supreme Court backed off of its *ASARCO* holding in its most recent case, *Container Corp.* v. *Franchise Tax Board*, 463 U.S. 159 (1983). In *Container*, the Court stated that there was a requirement that the out-of-state activities of the purported "unitary business" be related in some concrete way to the in-state activities. The Court explained that the functional meaning of this requirement is that there be some sharing or exchange of value not capable of precise identification or measurement — beyond the mere flow of funds arising out of a passive investment or a distinct business operation — which renders formula apportionment a reasonable method of

taxation.

Again, we disagree with the appellant's reading of this Supreme Court case. We do not see how the "flow of value" analysis in *Container* benefits the appellant's case here. It appears to be just a rewording of principles set out in the earlier cases. Further, we do not read the *Container* case as limiting the Court's holding in *ASARCO*. To the contrary, *ASARCO* is cited with approval throughout the *Container* case.

■ In sum, we agree with the chancellor that, in complying with the holdings in the foregoing Supreme Court cases, he was obliged to utilize the "unitary business principle" in this case. Those holdings also require us to overrule the case of *Qualls* v. *Montgomery Ward*, 266 Ark. 207, 585 SW.2d 18 (1979), and to declare appellant's Regulation 1984-2 to be unconstitutional. As a side comment, we note that Arkansas is not the first state to have to reevaluate its taxation of multistate corporations after the above Supreme Court cases were decided. *See, e.g., James* v. *Intern. Tel. & Tel. Corp*, 654 S.W.2d 865 (Mo. banc 1983); *American Homes Products Corp.* v. *Limbach*, 49 Ohio St. 3d 158, 551 N.E.2d 201 (1990); *Corning Glass Works* v. *Va. Dept. of Tax*, 402 S.E.2d 35 (Va. 1991). Now that we have affirmed the chancellor's application of the law in this case, we must address the appellant's challenge that the chancellor's findings of fact in regard to ITW's capital assets are clearly erroneous.

■ First, in applying the "unitary business principle," the chancellor found that ITW's capital gains income from the sale of its stock interest in NISCO, NIFCO, and CPI was "nonbusiness income" for Arkansas UDITPA purposes. We agree. At no time did ITW hold the majority of the stock in these companies, and while ITW had two or three directors on the companies' boards, there is no showing that ITW had a controlling interest or part. The potential to operate a company as part of a "unitary business" is not dispositive, when in fact there is a discrete business enterprise. *F.W. Woolworth Co.* v. *Taxation & Revenue Dept.*, 458 U.S. 354 (1982). There were no common employees or officers, and ITW did not provide any administrative services to the companies. While NISCO and NIFCO did utilize some of ITW's patented technology, they paid a royalty to ITW for the use of that technology and that royalty income was taxed by ITW

as "business income." In sum, the record shows that these companies were operated as discrete and separate businesses and not as a part of a "unitary business."

■ Further, the record also clearly supports the chancellor's finding that ITW's capital gains from the redemption of U.S. Treasury Notes, foreign currency transactions, and the installment sale of undeveloped land located in Chicago were not an integral part of ITW's regular manufacturing and leasing businesses carried on at the Pine Bluff plant. Instead, we agree with the chancellor's classification of these assets as normal or passive investments of ITW. As pointed out so clearly in *ASARCO*, the business of a corporation requires that it earn money to continue its operations and to provide a return on its invested capital but the use of this money for the business does not fit the "unitary business principle" test.

■ For the foregoing reasons, we affirm the chancellor's findings of fact and conclusions of law in applying the "unitary business principle" to the facts of this case. In conclusion, we briefly mention ITW's argument that the chancellor erred in denying its request for attorneys' fees. We simply are unable to reach this issue because ITW failed to file a notice of a cross appeal as required under ARAP Rule 3(d). *See Independence Fed'l S&L Ass'n* v. *Davis*, 278 Ark. 387, 646 S.W.2d 336 (1983).

Affirmed.

HAYS, J., dissents.

STEELE HAYS, Justice, dissenting. I respectfully disagree with the majority, as I believe it has rushed to judgment in an area that will have substantial impact upon our state, and is at the same time, complex, transitional and, above all, abstruse. *See* P. Hartman, *Federal Limitations on State and Local Taxation* § 9:30 (Supp. 1990).

While the United States Supreme Court has begun work on the unitary business principle, as the majority discussed, the application and impact of that principle has generated much litigation and very little harmony. *Id.* at 396. As evidenced just by the complexities of the discussion of this issue, answers are not easily ascertainable and few have been provided by the Supreme Court decisions. *See* e.g., P. Hartman, *Federal Limitations on*

*State and Local Taxation* § 9 (1981 and Supp. 1990); J. Hellerstein, *State Taxation, Corporate Income and Franchise Taxes* §§ 8 and 9 (1983 and Supp. 1989); *Constitutional Law* 96 Harv. L. Rev. 62 (1982); C. Floyd, *The Unitary Business in State Taxation: Confusion at the Supreme Court?*, 1982 B. Y. U. L. Rev. 465. It has even been suggested that because of its complexities, the issue is one the courts are not equipped to handle:

> Given the limitations within which the court must operate, it is entirely possible that it would be infeasible for the court to examine all of the intricacies of the unitary business and formula apportionment in order to determine whether a business is unitary and fairly subjected to taxation by a standardized apportionment formula. *Fair formula apportionment of divers kinds of business involves a substantial knowledge of the operations of a great variety of industries that are taxed, as well as technical problems of accounting. Courts are hardly equipped satisfactorily to handle such problems. Perhaps the complexities of the problem suggest some broad legislative guidance, fair to the states and the taxpayers, as part of a solution.* [Our emphasis.]

P. Hartman, Federal Limitations on State and Local Taxation, § 9:29 (1981).

With that in mind, I think it improvident to decide, as the majority does, the constitutionality of a question that the Supreme Court itself has not yet passed on, and which still stands as good law. The argument presented by the state in this case is closely related to the issue in *Qualls* v. *Montgomery*, 266 Ark. 207, 585 S.W.2d 18 (1979), and has not yet been addressed by the United States Supreme Court, much less overruled, as pronounced by the majority.

In *Qualls*, we addressed the question of interest from loans made by Ward to relative subsidiaries and corporations and whether that should qualify as "business income" and, hence, apportionable. Our current statute provides the same definition relevant in *Qualls*:

> 26-51-701(a) "Business income" means income arising from transactions and activity in the regular course of the taxpayer's trade or business and includes income and

tangible and intangible property if the acquisition, management and disposition of the property constitue integral parts of the taxpayer's regular trade or business operations.

We held that the interest was *business* income, not, as the majority states, simply because funds were commingled, but because the loans constituted transactions in the "regular course of Ward's business," pursuant to the statutory definition.

We addressed Ward's contention that the corporate relatives were not part of a unitary business, and responded, in essence, that that question need not be answered if the income came from activities that were in the regular course of the taxpayer's trade or business. Or, to put it in terms the United States Supreme Court would now employ, the fact that the loan transactions were part of Ward's regular course of business, was sufficient to find these transactions were part of a unitary business. This is essentially what the state is arguing here—that the investment income is part of ITW's unitary trade or business because the investment activities make up part of ITW's *regular trade and business*.

The Supreme Court's discussions in those cases cited by the majority involved only whether there was unity between the taxpayer and the income source on the basis of the extent and quality of interconnectedness of the taxpayer and the questioned operation. The court did *not* address the question of an income source being part of the taxpayer's unitary business, solely on the basis of the frequency or regularity of an activity, as was the situation in *Qualls*, and specifically here, as argued by the state, that investments were a regular and integral part of its business.

This approach is not novel with either *Qualls* or the appellant. In fact, as pointed out in P. Hartman, *Federal Limitations on State and Local Taxation* § 9:30 at 437-439 (Supp. 1990), in *ASARCO* v. *Idaho State Tax Comm'n*, 458 U.S. 307 (1982), cited by the majority, ASARCO's own counsel agreed that while not present in its case, investments could be an "adjunct to the actual conduct of the taxpayer's own business," and could be found to be part of a unitary business, and apportionable. And while the United States Supreme Court has not addressed this question, several lower courts have and the inclination is to allow apportionment in those cases. *See* e.g.,

*Bendix Corp.* v. *Director Div. of Tax.*, 568 A.2d 59 (N.J. Super A.D. 1989); *NCR Corp.* v. *Comptroller of the Treasury*, 313 Md. 118, 544 A.2d 764 (1988); *Welded Tube Co. of America* v. *Comm.*, 515 A.2d 911 (Pa. Comwlth 1986); *Lone Star Steel Co.* v. *Dolan*, 669 P.2d 916 (Colo. 1983).

The other important factor which the majority fails to mention is the burden of proof in these cases. It is not incumbent upon the state to show sufficient nexus between the apportioned income and the taxpayer. Rather, there is no question but that the burden is on the taxpayer. The state's taxation is of course presumptively constitutional, *Fisher* v. *Perroni*, 299 Ark. 227, 771 S.W.2d 766 (1989); *Love* v. *Hill*, 297 Ark. 96, 759 S.W.2d 550 (1988), and to overcome this presumption, the taxpayer has the "distinct burden of showing by clear and cogent evidence," that the statutory scheme "results in extraterritorial values being taxes." *Container Corp. of America* v. *Franchise Tax Bd.*, 463 U.S. 159 (1983); *Exxon Corp.* v. *Wisconsin Dept. of Revenue*, 447 U.S. 207 (1980). The question in this case then, boils down to whether ITW showed by clear and cogent evidence that taxation on the investment income was unconstitutional.

There was evidence, as noted by the majority, to show a lack of interconnectedness between ITW and the companies or sources in which it had invested, that is to say, ITW did not have a majority share in its holdings and had no controlling interest, had no common officers or employees and did not provide any administrative services to the companies.

While this may or may not have been clear and cogent evidence of interconnectedness, such a finding is not controlling here. Rather, we look at the evidence in light of the state's argument that investing was a regular part of the business so as to make the investing operations part of ITW's unitary business. There is no discussion of such evidence in either the appellee's brief or the majority opinion, yet a mere glance at the record substantiates the state's claim. The most critical evidence on this point was given by ITW's vice president and treasurer, David Byron Smith, who testified that all the management of investments was handled through his office; that it was a significant part of the treasurer's operations; that he would spend an hour or so each day working on investments, and that such investments were

one of four priorities of the company. He further testified the money received from investments was used as working capital, and working capital was used for investment purposes, but the testimony was ultimately inconclusive on this point. In the face of this testimony, it is clear, to me at least, that ITW has failed to meet its burden.

As the direction of the United States Supreme Court is unsettled, and the consequences far reaching, I cannot join the majority's venture in this area, particularly, where the record has not been sufficiently developed on this question and the appellee's burden of proof was consequently lacking.